David **CHAYO** and Danielle Chayo, individually and on behalf of their minor children, Chaya Mushka Chayo, Rachel Lea Chayo and Avraham Menachem Mendel Chayo, Plaintiffs,

v.

Gregory **KALADJIAN**, individually, and as acting Commissioner of the New York State Department of Social Services, Barbara Sabol, individually, and as Administrator of the New York City Human Resources Administration Child Welfare Administration, Lisa Rollins, individually, and as Caseworker in the New York City Human Resources Administration Child Welfare Administration, Sherri Rickson, individually, and as Caseworker in the New York City Human Resources Administration Child Welfare Administration, Earline Epps, individually, and as Caseworker in the New York City Human Resources Administration Child Welfare Administration, Edwise Brunache, individually, and as Caseworker in the New York City Human Resources Administration, Lee Brown, individually, and as Commissioner of the New York City Police Department, Officer James McCabe, individually, and as Police Officer with the New York City Police Department, Officer Sharon Paul, individually, and as Police Officer with the New York City

---

Police Department, Officer David Riol, individually, and as Police Officer with the New York City Police Department, and Officer James Carfora, individually, and as Police Officer with the New York City Police Department, Defendants.

No. 91 Civ. 7021 (PKL).

United States District Court, S.D. New York.

Feb. 9, 1994.

Robert Abrams, New York State Atty. Gen., New York City (Judith Nathan, Robert J. Schack, of counsel), for defendant Kaladjian.

O. Peter Sherwood, Corp. Counsel of the City of New York, New York City (Elisabeth Palladino, of counsel), for New York City defendants.

## OPINION AND ORDER

LEISURE, District Judge.

This case arises out of the involuntary removal and examination, for suspected child abuse, of Chaya Mushka Chayo, Rachel Lea Chayo and Avraham Menachem. Mendel Chayo, the children of Danielle and David Chayo. Mr. and Mrs. Chayo, individually and on behalf of their children, assert a variety of causes of action, pursuant to both 42 U.S.C. § 1983 and state law, against Barbara Sabol, Administrator of the New York City Human. Resources Administration ("HRA"), Lisa Rollins, Sherri Rickson, Earline Epps and Edwise Brunache (the "Caseworkers"), Lee Brown, Commissioner of the New York City Police Department, Sergeant James McCabe, Police Officers Sharon Paul, David Riol, James Carfora (collectively, the "City Defendants") and Gregory Kaladjian, Commissioner of the New York State Department of Social Services.

Kaladjian moves to dismiss the claims against him pursuant to Fed.R.Civ.P. 12(b)(6) and for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). The City Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56 and to dismiss the state law claims for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). For the reasons stated below, the defendants' motions are granted in their entirety.

## I. STANDARD FOR SUMMARY JUDGMENT

"Summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Richardson v. Selsky*, 5 F.3d 616, 620 (2d Cir.1993). In

Shea & Gould, New York City (Alysson Weiss, Barry G. Margolis, of counsel), for plaintiffs.

deciding the motion, the Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *See Gladstone v. Fireman's Fund Ins. Co.,* 536 F.2d 1403, 1406 (2d Cir.1976) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975)). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992); *Accord, Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying which materials "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once a motion for summary judgment is properly made, however, the burden then shifts to the nonmoving party, which " 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

## II. BACKGROUND

Applying the above principles, the facts of this case are as follows. Sometime in November of 1990, Mrs. Chayo brought her daughter, Rachel Lea, to Empire Medical Center for skull x-rays. The x-rays showed that the child had sustained a minor skull fracture. Two months later, on January 8, 1991, at approximately 11:00 a.m., she brought her other daughter, Chaya Mushka, to Empire Medical Center for a skull x-ray. Chaya Mushka had a bruise on her forehead that her mother claimed resulted from a fall from her high chair. Later that afternoon, as a result of the visit, a 2221 report (the "2221 Report") was filed with New York State Department of Social Services Central Register of Child Abuse and Maltreatment, which referred the Report to the New York City Human Resources Administration, Child Welfare Administration ("HRA/CWA").[1]

A 2221 report is a report of suspected child abuse and maltreatment. The 2221 Report concerning the Chayo children came from what is known as a "mandated source," a person or official required by New York State law to report cases of suspected child abuse. Mandated sources include physicians, nurses, school officials, and day care center workers. The Report noted that both Chaya Mushka and Rachel Lea had been brought in for skull x-rays and that Chaya Mushka's injuries were inconsistent with the mother's explanation. The 2221 Report did not provide information as to the treatment Chaya Mushka received at Empire Medical Center or the results of her medical examination.

The follow up investigation of the 2221 Report was delegated to defendant Rickson's unit with the HRA/CWA. Rickson attempted unsuccessfully to communicate with the source of the Report, who had left for the day. Declaration of Sheri Rickson, dated April 22, 1992, at ¶ 4. Rickson conferred with the Child Protective Manager for her unit, Rhoda Poblet, and they decided that the Chayo children had to be examined at a hospital that evening. They also concluded that it was too late in the day to get a court order but that the allegations in the Report were sufficiently serious to permit medical examinations of the Chayo children without parental consent or a court order.

Caseworkers Brunache and Epps were instructed to visit the Chayo home, interview the family, and take the children to the hospital. The covering supervisor that evening, Lisa Rollins, was apprised of the situation and given a copy of the 2221 Report. At about 6:00 p.m. that evening, Ms. Brunache and Ms. Epps appeared at the Chayo home. They explained to Mrs. Chayo that there had been an accusation that her children were victims of child abuse. Mrs. Chayo let the two caseworkers enter her home, where the three Chayo children were present. Mrs. Chayo cooperated with the caseworkers when questioned by Ms. Brunache about

---

1. The Report has been redacted to conceal the identity of the person filing the Report pursuant to state law.

Chaya Mushka and Rachel Lea's injuries. At the request of the caseworkers, Mrs. Chayo undressed her children so the caseworkers could look for bruises and other possible signs of abuse. The caseworkers apparently did not find any additional signs of abuse other than the injury to Chaya Mushka's forehead.

The caseworkers informed Mrs. Chayo that they had been instructed to take her children to a hospital for a medical examination. They told Mrs. Chayo that she could not accompany them in the cab, but could be present at the hospital. Mrs. Chayo requested that the caseworkers wait approximately one hour for her husband to return. The caseworkers were not willing to wait, but permitted Mrs. Chayo to call a family friend, Rabbi Lieberman, to accompany her to the hospital. Upon his arrival, the caseworkers apprised Rabbi Lieberman of the allegations contained in the 2221 Report. Rabbi Lieberman opposed the removal of the children from the Chayo home. The caseworkers called their supervisor, Ms. Rollins, explained the situation, and were instructed to call the police for assistance in the removal of the Chayo children. Police Officers David Riol and James Carfora arrived and, after learning of the alleged child abuse and the caseworkers' intent to take the children to the hospital, contacted their supervisor.

Shortly thereafter, Mr. Chayo arrived and then Sergeant McCabe and Police Officer Sharon Paul. The caseworkers presented McCabe with the 2221 Report and explained to him that they had been instructed to have the children examined. The Chayo family lawyer, Mr. Yisroel Schulman, arrived at the Chayo home and insisted that the children could not be examined without a court order or parental consent. Both Mr. Schulman and Sergeant McCabe spoke on the phone with Ms. Rollins and Ms. Rickson. McCabe also spoke with his own superior, Captain Robert Mescallotto. The police agreed to aid in the removal of the Chayo children.

An argument ensued regarding which hospital the children would be taken to. The caseworkers and police officers were concerned that Rabbi Lieberman and Mr. Schulman would interrupt and frustrate the medi-cal examinations. Accordingly, the caseworkers decided that they would not inform the parents of which hospital they were taking the children to until later that evening. The caseworkers took the children to St. Vincent's Hospital at about 11:00 p.m. The attending physician examined the children and ordered x-rays taken of Chaya Mushka and Rachel Lea. The results of the medical examinations revealed no physical evidence of child abuse. At about 4:00 a.m., Ms. Rickson was informed of the results and instructed the caseworkers to return the Chayo children to their home. The children were returned shortly thereafter and their parents were notified that no signs of abuse were found.

## III. QUALIFIED IMMUNITY

■ Qualified immunity shields government officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This doctrine promotes the " 'public interest in encouraging the vigorous exercise of official authority' " by protecting officials performing discretionary functions. *Harlow* at 807, 102 S.Ct. at 2732 (1982) (quoting *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978)).

■ Government officials may establish qualified immunity by, *inter alia,* showing that it was "objectively reasonable for the officials to believe that their actions did not violate [the plaintiff's] rights." *Richardson,* 5 F.3d at 621. *Accord Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739 (stating that test for qualified immunity "focuses on the objective legal reasonableness of an official's acts" in light of "clearly established" legal rules); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Moreover, qualified immunity is applicable even where officials "of reasonable competence could disagree" that such acts were objectively reasonable. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

■ "[Q]ualified immunity questions should be resolved at the earliest possible stage of a litigation," either in a motion to dismiss, or, after discovery on the limited question of objective reasonableness of the challenged action, in a motion for summary judgement. *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042, n. 6, 97 L.Ed.2d 523 (1987). Such an approach allows for the elimination of "meritless actions against public officials at the earliest possible stage in the litigation." *Mozzochi v. Borden,* 959 F.2d 1174, 1177–78 (2d Cir.1992) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985)). *Accord Musso v. Hourigan,* 836 F.2d 736, 742 & n. 1 (2d Cir.1988); *Robison v. Via,* 821 F.2d 913, 920 (2d Cir.1987). Indeed the standard of objective reasonableness is "designed to 'permit the resolution of many insubstantial claims on summary judgment.'" *Robison* at 920 (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738). *See also Zinker v. Doty,* 907 F.2d 357, 359 (2d Cir.1990) ("Because the test of reasonableness thus prescribed is an objective one ... in most cases, the defense of qualified immunity properly lends itself to summary disposition.").

Summary judgement may be granted if "the defendant[s] adduce[ ] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[s]' to believe that [they were] acting in a fashion that did not clearly violate an established federally protected right." *Robison,* 821 F.2d at 921; (quoting *Halperin v. Kissinger,* 807 F.2d 180, 189 (D.C.Cir.1986)). In other words, summary judgment will be granted if "it was objectively reasonable for the defendants to make the decision they made, and no rational jury could find that it was not." *Van Emrik v. Chemung County Dept of Social Services,* 911 F.2d 863, 866 (2d Cir.1990).

■ In the instant case, the Court finds that the Caseworkers are protected by qualified immunity. The Court begins with an awareness of the difficult choices facing caseworkers investigating suspected child abuse: "If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child ..." *Van Emrik,* 911 F.2d at 866. Accordingly, caseworkers may establish that they acted reasonably in removing a child from parental custody "if the officials have been presented with evidence of serious ongoing abuse and therefore have reason to fear imminent recurrence." *Robison,* 821 F.2d at 922.

In the instant case, the caseworkers based their decision on the 2221 report which reads as follows:

> Mushka has bruising on the top of her forehead and on her back. Ch[ild] was brought to [doctor] today for a skull x-ray. Mo[ther] claims ch[ild] has fallen from a high chair. Injuries are inconsistent with explanation. Recently, Rachel was brought to [doctor] for a skull x-ray (Nov. '90). Mo[ther] explained that ch[ild] fell from a bunk bed. Ch[ild] had a fractured skull. So[urce] feels ch[ildren] are being abused by parents at home and is very concerned for ch[ildren's] safety.

Defendants' Notice of Motion, at Exhibit A. This information provided two independent bases on which to suspect child abuse. First, the Report noted that there had been two separate injuries to the Chayo children, both to the skull, and one of which was plainly serious. Second, the Report suggested that the injuries were inconsistent with the mother's explanation, a circumstance generally indicating child abuse in the experience of the caseworkers. *See* Declaration of Rhoda Poblet, dated April 21, 1992, at ¶¶ 7 and 8. Finally, the nature of the injuries, particularly the skull fracture, suggested that the children were in serious physical danger if the injuries were in fact the product of child abuse.

The plaintiffs argue that the caseworkers' acts were nonetheless unreasonable. The plaintiffs attempt to compare the instant case to *Good v. Dauphin County Social Services,* 891 F.2d 1087 (3d Cir.1989) in which qualified immunity was not found applicable. That case, however, is plainly inapposite for it involved a single anonymous report of bruises of unspecified severity. *Id.* at 1095. In

the instant case, the report was not anonymous and the injuries were serious, specified and multiple.

The plaintiffs also contend that this Court should consider their allegations that caseworkers Epps and Brunache "repeatedly stated to Mrs. Chayo and to other persons present in the Chayo home that they did not see any evidence of abuse, and that they did not believe the children were in *any* danger, much less imminent danger." Plaintiffs' Memorandum in Opposition to Defendants' Motions, at 42 ("Opposition Memorandum"). However, the mere fact that no evidence of abuse was discovered at the home was not a basis for concluding there was no imminent danger. Child abuse could not be ruled out given the content of the 2221 Report. Accordingly, examination by a physician was still appropriate. In addition, the caseworkers' alleged statements that they did not believe the children were in danger are also of limited importance. To remove children, caseworkers need not "believe" that child abuse is ongoing and that danger is imminent; caseworkers need only have been "presented with evidence" of abuse and have "reason to fear" that danger is imminent. *Robison*, 821 F.2d at 922. The caseworkers' statements are not inconsistent with this standard. Moreover, the Court need not turn a blind eye to the likelihood that caseworkers may seek to defuse the confrontation inherent in their difficult task by characterizing their efforts to parents more as an attempt to investigate a report than to confirm a personal belief in the parents' guilt. Accordingly, little weight can be given to these alleged statements in comparison with the 2221 Report that was the basis for the caseworkers' actions and their superiors' instructions. In any event, these statements have little importance because ˆit is this Court's task to focus on the "objective legal reasonableness" of the defendants' actions, *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738, rather than the defendants' subjective state of mind. There is no issue of material fact concerning the existence or content of the 2221 Report. This Court concludes that the examination of the Chayo children was objectively reasonable in light of the Report.

The plaintiffs, citing *Van Emrik*, 911 F.2d 863, also contend that even if a medical examination of the children was merited, an x-ray examination was not. In *Van Emrik*, the Court of Appeals for the Second Circuit held that "in the absence of parental consent, x-rays of [a] child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances." *Van Emrik*, 911 F.2d at 867. The instant case is distinguishable, however, because the x-ray examinations were ordered not by the caseworkers but by Dr. Ibrahm Ahmed, a pediatric resident at St. Vincent's Hospital, and for medical rather than investigative purposes. Dr. Ahmed's declaration squarely supports this account. He states that "the caseworkers did not request that the x-rays of the children be taken" but rather that he ordered the x-rays "to facilitate [his] diagnoses of the children and to determine what treatment, if any, was necessary." *See* Declaration of Ibrahm Ahmed, dated January 25, 1993, at ¶ 6–7. The Second Circuit's decision in *Van Emrik* plainly envisions that medically necessary x-rays may be taken without judicial approval or parental consent for it acknowledges the validity of N.Y.Soc.Serv.Law § 416 (McKinney 1983) which provides that children examined for abuse may be given an x-ray examination "if medically indicated." *Van Emrik* at 867. The plaintiffs contend that, notwithstanding Dr. Ahmed's declaration, the x-ray examinations were unnecessary because they duplicated x-ray examinations that had already been given. However, the plaintiffs thereby take issue with Dr. Ahmed's medical judgment rather than with the actions of the government officials who are the defendants in this action.

The plaintiffs also contest the claim that the caseworkers did not request the x-rays in question. However, the caseworkers have met the summary judgment standard on this issue. The defendants have provided an affidavit squarely supporting their contention that the x-rays were not requested by the caseworkers. This Court is given no reason

to doubt the truthfulness of the statement of this non-party physician taking full responsibility for the decision to order x-rays and denying that any request was made by the caseworkers. Accordingly, the defendants met their burden of coming forward with proof why summary judgment should be granted on this issue and the burden of proof shifted to the plaintiffs to provide evidence in rebuttal. *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The plaintiffs have not offered any such evidence.[2]

The plaintiffs nonetheless urge a broad reading of *Van Emrik* that would bring the instant case within its scope. The plaintiffs note that in *Van Emrik*, like the instant case, the physician, rather than the caseworker, actually ordered the x-rays in question and that this did not preclude the Second Circuit from finding that the x-rays were "initiated" by and taken "at the behest of" the caseworker. *Van Emrik* at 867. However, in *Van Emrik* the physician actually opposed an x-ray examination because of concern about subjecting the child to unnecessary radiation. *Id.* at 865. Only when the caseworker explained her investigative rationale for the x-rays did the doctor state that he " 'could agree' " to order the x-rays taken. *Id.* In this case, there is no evidence that the caseworkers even mentioned x-rays, much less requested they be taken. The terms "initiated" and "at the behest of" certainly suggest a more active role than this and could only comprise the state officials' actions if the

Court gave these terms an unusually broad construction. Such a construction is supported neither by the language nor the facts of *Van Emrik*.[3]

■ Accordingly, this Court finds that, drawing all reasonable inferences in favor of the plaintiffs, the x-rays could not be shown to have been taken at the behest of the defendant government officials in this case. Accordingly, no violation of the plaintiffs' constitutional rights was effected by these x-ray exams. The Court has already concluded that no juror could find that the decision to examine the children was not objectively reasonable. Accordingly, this Court finds that the Caseworkers are protected from suit by qualified immunity. In addition, Sergeant James McCabe and Police Officers Sharon Paul, David Fiol, James Carfora are protected from suit by qualified immunity based on their reasonable reliance on the Caseworkers' assessments.

## IV. CLAIMS AGAINST BARBARA SABOL AND LEE BROWN

■ Defendants Sabol and Brown seek dismissal of plaintiffs' suit for money damages against New York City under 42 U.S.C. § 1983, constituting counts one through sixteen of the First Amended Complaint. To prevail against municipal defendants, "a section 1983 plaintiff must 'prove the existence of a municipal policy or custom' that caused

---

2. The plaintiffs contend that Dr. Ahmed's account is contradicted by the medical records of the examinations. The plaintiffs claim that these records state that "the purpose of the medical examinations, including the x-rays, was '*to make sure the children are not being abused.*' " Opposition Memorandum at 48–49. The plaintiffs cite to Exhibit A of the Affidavit of Danielle Chayo, sworn to on October 22, 1992. They do not specify either the page number or document thereof to which they refer and the precise quote they identify does not appear in Exhibit A. The Court concludes that plaintiffs are referring to the nursing assessment of Rachel Chayo at page 5 of Exhibit A which states: "We need to be Sure the Children are not being abused." The plaintiffs' characterization of this statement is misleading. The document makes no reference to x-rays. Its conclusion is merely that the child will be seen by Dr. Ahmed "[f]or further evaluation." Moreover, this nursing assessment plainly has a very limited bearing on Dr. Ahmed's reasons for

ordering the x-rays, particularly since it was made before Dr. Ahmed decided to order x-rays. More importantly, it does not in any way suggest that the caseworkers requested the x-rays.

3. The Court, of course, does not address the question of what approach by caseworkers may be the most desirable. Caseworkers will likely be more familiar with the legal constraints concerning child abuse investigations than the physicians who conduct physical examinations at their request. Accordingly, in light of the concerns expressed in *Van Emrik* regarding x-ray examinations without parental consent, it would appear to this Court entirely appropriate for caseworkers to play a role in informing physicians that their authority to administer such examinations is limited to those instances in which they are medically necessary. However, this Court does not find that such an affirmative role is constitutionally mandated by *Van Emrik*.

his injuries and, second, 'plaintiff must establish a causal connection ... between the policy and the deprivation of his constitutional rights.'" *Sarus v. Rotundo*, 831 F.2d 397, 400 (2d Cir.1987) (quoting *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir.1985)). The threshold question is whether there has been a deprivation of a constitutional right. *Duchesne v. Sugarman*, 566 F.2d 817, 824 (2d Cir.1977). Such deprivation has occurred where the appellants have been deprived of an interest encompassed by the Fourteenth Amendment's protection of liberty and property, and such deprivation has occurred without due process of law. *Id.* (citing *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972) and *Morrissey v. Brewer*, 408 U.S. 471, 484, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484 (1972)).

It is undisputed that the plaintiffs' interest in not being separated as a family and in not being subject to medical examination without consent is a liberty interest protected by the Fourteenth Amendment. *See Van Emrik*, 911 F.2d at 865; *Duchesne*, 566 F.2d at 824–25. However, the removal and examination were not effected without due process of law. Even in the absence of parental consent or a judicial order, children may be temporarily removed from their parents' custody without a violation of due process when the removal is taken as an emergency measure to protect the children's interest. *See Duchesne*, 566 F.2d at 826. *Cf. Parratt v. Taylor*, 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981) ("The fundamental requirement of due process is the opportunity to be heard and it is an 'opportunity which must be granted at a meaningful time and in a meaningful manner ...' However ... we have rejected the proposition that 'at a meaningful time and in a meaningful manner' *always* requires the State to provide a hearing prior to the initial deprivation of property.") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). As detailed above, the Caseworkers had sufficient reason to believe that the Chayo children might be in imminent danger as a result of ongoing child abuse. The steps they took in light of the information available to them and the risk of danger to the Chayo children were reasonable. Consequently, the plaintiffs were not deprived of due process by this temporary removal.

The plaintiffs make various criticisms of the supervision given to social workers and the regulations regarding investigation. The plaintiffs contend, *inter alia*, that "imminent danger" is not sufficiently well defined in these regulations; that the risk assessment factors are not prioritized; and that the appropriate hours for investigating child abuse are not specified. However, the plaintiffs have identified no case law which suggests that these defects rise to the level of constitutional violations and the Court does not regard them as such.

The plaintiffs also question whether it was necessary to conceal from Mr. and Mrs. Chayo the identity of the hospital to which the children were being taken. Reasonable persons might certainly disagree with this decision. However, the fact that Mr. and Mrs. Chayo were unaware of the location of their children for only a few hours does not transform an otherwise justified examination into a constitutional violation.

Thus, this Court finds that there was no violation of the plaintiffs' constitutional rights. Accordingly, the section 1983 claims of the plaintiffs against defendants Sabol and Brown are hereby dismissed.

## V. CLAIMS AGAINST KALADJIAN

Kaladjian moves to dismiss the claims against him pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c). When considering a motion to dismiss pursuant to 12(b)(6) a court must take all factual allegations in the complaint as true and construe all reasonable inferences in favor of the plaintiff. *LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir.1991). The Court applies this same standard when considering a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). *Ad–Hoc Committee v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir.1987).

### A. Claims for Money Damages to Be Paid From the State Treasury

■ The Eleventh Amendment to the United States Constitution bars a suit by private parties seeking to impose a liability

which must be paid from public funds in a state treasury. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). Accordingly, plaintiffs are barred from seeking money damages from defendant Kaladjian in his official capacity.

### B. Claims Against Kaladjian in His Individual Capacity

■ A defendant's personal involvement in an alleged constitutional violation is a prerequisite to the imposition of damages under section 1983. *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986). There are four ways in which a supervisory official may be personally involved in a 1983 violation: he may (1) have directly participated in the infraction or be directly involved through ordering that the action be taken; (2) have failed to remedy a wrong after learning of the violation; (3) have created or allowed a policy to continue under which the violation occurred; (4) have been grossly negligent in managing the subordinates who caused the violation. *Id.* at 323–24.

■ The plaintiffs appear to allege that Kaladjian created a policy under which the violation occurred. However, claims brought under section 1983 require specific allegations at the pleading stage and thus represent a departure from the liberal pleading requirements set forth in Rule 8(a). *Sanders v. City of New York*, 692 F.Supp. 308, 311 (S.D.N.Y.1988). *See also Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir.1987). Accordingly, this Court has repeatedly held that the allegation of one incident is insufficient to maintain a claim against a municipality. *Sanders*, 692 F.Supp. at 312; *Camarano v. City of New York*, 624 F.Supp. 1144, 1146 (S.D.N.Y.1986) ("Allegation of a single instance of mistreatment by a police officer ... is insufficient to establish an unconstitutional municipal policy attributed to a municipal policymaker"); *Clayton v. City of New York*, 596 F.Supp. 355, 359 (S.D.N.Y.1984) ("It is generally necessary to assert more facts than those related to the one incident involved to

establish a claim of 'pattern and practice'."). While in the cited cases the claims alleging an unconstitutional policy were asserted against municipalities, the Court concludes that the same pleading requirements apply to claims against individual defendants. As then District Judge Newman explained in *Smith v. Ambrogio*, 456 F.Supp. 1130 (D.Conn.1978):

> [A] claim of municipal liability based on an alleged policy reflected by a pattern of prior episodes will inevitably risk placing an entire police department on trial. Sweeping discovery will be sought to unearth episodes in which allegedly similar unconstitutional actions have been taken, and the trial will then require litigation of every episode occurring in the community that counsel believes can be shown to involve a similar constitutional violation. Even if a trial of that scope is warranted by a complaint that does allege overt acts with requisite particularity, neither a federal court nor a municipality should be burdened with such an action unless a detailed pleading is presented.

*Id.* at 1137 (citation omitted). These considerations apply regardless of whether the defendant is a municipality or a supervisory official sued in his personal capacity. Accordingly, the same requirement of a detailed pleading should clearly apply.

In the instant case, plaintiffs have alleged only a single incident in which their constitutional rights were allegedly violated. Thus, plaintiffs have clearly failed to meet the burden of alleging facts that suggest Kaladjian established a policy under which the alleged violation occurred.

### VI. DECLARATORY AND INJUNCTIVE RELIEF

Finally, the plaintiffs seek declaratory and injunctive relief that the defendants violated their constitutional rights. Such relief is clearly inappropriate in light of this Court's conclusion that no constitutional violations occurred.[4]

---

4. The Court's dismissal of the claims for money damages against Kaladjian in his official capacity are premised on 11th Amendment concerns that would not bar declaratory or injunctive relief.

However, the same considerations that lead this Court to conclude that plaintiffs have not pled a claim against Kaladjian in his personal capacity, also lead to the conclusion that plaintiffs have

## VII. JURISDICTION OVER THE PENDANT STATE LAW CLAIMS

■ The sole basis for this Court's jurisdiction over plaintiffs' various state law claims against defendants is this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a). A court may decline to exercise such jurisdiction when the court has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3) (Supp. I 1990) (enacted December 1, 1990). Moreover, dismissal of pendent state law claims is particularly appropriate where all federal claims have been eliminated before trial. *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988); *DiLaura v. Power Authority,* 982 F.2d 73, 80 (2d Cir.1992).

The Court has dismissed all of the claims in this case over which it has federal subject matter jurisdiction. Accordingly, this Court dismisses the pendent state law claims pursuant to Fed.R.Civ.P. 12(b)(1) and 28 U.S.C. 1367(c).[5]

### CONCLUSION

For the reasons stated above, the Court hereby grants the City Defendants' motion for summary judgment and grants Kaladjian's motion to dismiss pursuant to 12(b)(6). The Court also dismisses the remaining state law claims for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Accordingly, this case is hereby dismissed.

**SO ORDERED.**

---

not pled a claim against Kaladjian in his official capacity.

**5.** Defendant Kaladjian has not moved to dismiss the state law claims against him for lack of subject matter jurisdiction. However, the Court may dismiss a claim for lack of subject matter jurisdiction *sua sponte.* Fed.R.Civ.P. 12(h)(3).