**Faye TAYLOR, individually and on behalf of Tamika Taylor, an infant, and Artnell Taylor, Plaintiffs**

v.

**Kenneth EVANS, individually and as caseworker, Child Welfare Administration, Ramona Pinckney, individually and as caseworker, Child Welfare Administration, Barbara Sabol, individually and as Commissioner of Social Services of the City of New York, Robert Little, individually and as Deputy Commissioner of Social Services of the City of New York, and the City of New York, Defendants.**

No. 94 CIV. 8425(CSH).

United States District Court, S.D. New York.

Oct. 25, 1999.

---

Lanser & Kubitschek, New York, NY, for Plaintiffs. Of Counsel: Carolyn A. Kubitschek, Hayley Gorenberg, Susanne Cichanowicz, Law Student Intern, Carolyn Morehouse, Law Student Intern, Beth A. Orenstein, Law Student Intern, Erika Wood, Law Student Intern.

Paul A. Crotty, Corporation Counsel of the City of New York, New York, NY, for Defendants. Of Counsel: Elisa Baldwin.

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge.

Plaintiff Faye Taylor ("Taylor") brings this civil rights action individually and on behalf of her children Tamika Taylor and Artnell Taylor ("Tamika" and "Artnell") pursuant to 42 U.S.C. § 1983 and New York State law. The gravamen of plaintiffs' complaint is the allegedly unlawful and unconstitutional removals of Tamika and Artnell from their mother's custody on July 28, 1990 and August 3, 1990; the alleged strip search of Tamika on July 28, 1990; and the prosecution and imprisonment of Taylor on charges of assault and endangering the welfare of a child in 1991 and 1992. Plaintiffs name as defendants the City of New York and, in their individual and official capacities: Kenneth Evans and Ramona Pinckney, Child Welfare Administration ("CWA") caseworkers, Barbara Sabol, then Commissioner of the De-

partment of Social Services (DSS), and Robert Little, then Director of CWA.[1]

With discovery complete, defendants move for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on the ground that they did not violate any of plaintiffs' constitutional rights. In the alternative, defendants move for summary judgment in their individual capacities on the basis of immunity. For the reasons that follow, defendants' motion is granted in its entirety.

### FACTS

This lawsuit arises from the placement of an infant named Gary Maund ("Gary") in Taylor's home and the events following Gary's removal in July 1990. Gary was born in April 1989 with severe and multiple handicaps, including arthrogryposis multiplex congenita, HIV, Down's syndrome, asthma, talipses equinovarus, rhizomelic short-limbed dwarfism, otitis, dysmorphic features, polycythemia, drug withdrawal, and inability to speak. Gary immediately was placed in the custody of the Department of Social Services, where he remained until his death in 1993. As a result of his multiple handicaps, Gary required regular treatment and observation from physicians throughout his tragically short life.

In April 1990, Foundling Hospital placed Gary in Taylor's foster care. On July 26, 1990, Foundling Hospital, believing that Gary's health was too complicated for a foster parent to handle alone, removed Gary from Taylor's home and returned him to Incarnation Children's Center, where he had resided prior to his placement with Taylor.[2] Total body x-rays taken on the following day indicated that Gary had sustained multiple fractures that

were in various stages of healing. Dr. Sara Abramson, a pediatric radiologist who examined the x-rays, reported that the fractures were indicative of child abuse. Foundling Hospital proceeded to file a "Report of Suspected Child Abuse or Maltreatment" in the New York Central Registry pursuant to New York Social Services Law § 413.

The report prompted the CWA's concern that Taylor's two natural children, Tamika and Artnell, also might be at risk in Taylor's custody. Tamika and Artnell had resided with their mother since their births on June 27, 1987 and May 19, 1976 respectively. On July 28, 1990, the CWA assigned defendant Evans, a CWA caseworker, to investigate whether Taylor's children were at risk of harm.

Evans repaired first to the Incarnation Children's Center, where he spoke with a nurse about Gary's condition and spent an hour with Gary. In his deposition, Evans stated that he observed that Gary had swelling in both arms, lacerations on his head and throat area, scratches and abrasions on his back and legs, a bruise on one shoulder, a mark on his groin, and what appeared to be a fingernail scratch on his cheek. Evans Dep. at 111–12. By contrast, social worker Dana Carney testified in Family Court that Gary "appeared normal in every way," without any "fresh marks" when he returned to the Incarnation Children's Center. Plaintiffs' Exh. P at 29.

After visiting the Incarnation Children's Center, Evans spent approximately two hours at the Taylor home. He observed that the home was neat and adequately furnished, and that the children appeared to be clean, well behaved, and in good

---

**1.** Plaintiffs' complaint also named Dr. Stephen Nicholas as a defendant. However, plaintiffs voluntarily discontinued their action against Stephen Nicholas by stipulation dated August 1, 1996.

**2.** *See* Taylor Dep. at 158. In contrast, the medical summary prepared by Incarnation

Children's Center stated that Gary was readmitted "after removal from a foster home because of concerns about the parenting abilities of his foster mother." Defendants' Exh. A at 1. This dispute does not present a material issue of fact.

health. Evans questioned Taylor about how Gary received his injuries and concluded that Taylor's explanations were "inconsistent" with Gary's injuries. Evans also interviewed Artnell. According to defendants, Evans "visually observed Tamika's extremities for evidence of physical abuse." Defendants' R. 56.1 Statement at ¶ 7. By contrast, plaintiffs allege that Evans interrogated Tamika, and then "pulled up the oversized T-shirt Tamika was wearing and exposed her back," and "pulled down Tamika's underpants and exposed her buttocks." Taylor Aff. at ¶ ¶ 7, 8. On the basis of Gary's serious and unexplained injuries, Evans decided it was necessary to remove Tamika and Artnell from their mother's home to protect them from an imminent risk of harm.

Evans informed Taylor that he intended to place the two children in foster care in the custody of the DSS. Taylor requested that the two children be allowed to stay with her mother, Joyce Taylor. After verifying with the CWA that Joyce Taylor had no record of child abuse or neglect, Evans agreed to temporarily place the children with her. Evans informed Taylor that she could go to court to attempt to regain custody of her children.

On July 30, 1990, Taylor filed a petition under Family Court Act § 1028 seeking a court order returning the children to her custody. On August 1, 1990, Judge Zuckerman of the New York County Family Court ordered that the children be returned to Taylor's custody and that the CWA conduct a full child protective investigation on behalf of the two children within forty-eight hours. Pursuant to the court's order, defendant Pinckney, another CWA caseworker, conducted an investigation and submitted a report to the court. In it, she concluded that "[b]ased upon the seriousness of the foster child(s) injuries with no plausible explanation," the other children under Taylor's care "are also at risk based on a derivative effect." Plaintiffs' Exh. Q. Pinckney also indicated in her report that Taylor "is not complying with CWA investigation to have her children × Ray [sic]." *Id.* Plaintiffs contend that this was a deliberate falsehood. In support of this contention, they cite an anonymous case report indicating that the doctor who examined the children "didn't feel x-ray [sic] were necessary." Plaintiffs' Exh. F.

On August 3, 1990, Judge Gage of the New York County Family Court held a hearing and issued a preliminary order removing the two children from their mother's custody after concluding that removal was necessary to avoid imminent risk to their lives or health. The children were again temporarily placed in their grandmother's home. After a hearing on April 26, 1991, Judge Gage dismissed the CWA petitions on behalf of the two children.

In August 1990, the New York City Police Department Detective James Flaherty had begun to investigate allegations that Taylor had abused Gary, based upon the hospital report. At no time did Flaherty speak with anyone from CWA. Flaherty Dep. at 26. Taylor subsequently was indicted on nine counts of assault and one count of endangering the welfare of a child. On November 18, 1991, a jury convicted Taylor of endangering the welfare of a child and two counts of assault, but acquitted her of all other charges. The prosecutor in that case has testified that the District Attorney's Office was not urged or influenced by anyone from CWA to prosecute Taylor. Riccardi Dep. at 71. Taylor was incarcerated from November 18, 1991 until March 12, 1992, when a state appellate court ordered her release.

On May 11, 1993, the Appellate Division reversed Faye Taylor's conviction and remanded the matter for a new trial. The basis for the Appellate Division's decision was that the trial court had improperly responded to notes submitted by the jury during its deliberations without first showing them to Taylor's counsel. The Appellate Division noted in its opinion, however, that the "evidence was legally sufficient to

establish the defendant's guilt, and the verdict was not against the weight of the evidence." *People v. Taylor*, 192 A.D.2d 35, 36, 597 N.Y.S.2d 347, 348 (1st Dep't), *app. denied*, 82 N.Y.2d 708, 601 N.Y.S.2d 605, 619 N.E.2d 683 (1993). On November 18, 1993, the criminal proceedings against Taylor were terminated when the District Attorney decided not to pursue the case and it accordingly was dismissed by the court.

Plaintiffs' current action stems from their belief that "defendants attempted to cover up their own misdeeds by blaming the foster mother for [Gary's] injuries." Plaintiffs' Br. at 1. Taylor alleges that Foundling Hospital failed to properly train her to care for Gary given his special needs. According to Taylor, the only training she received took place on the day that Gary was placed in her home.

Specifically, plaintiffs contend that it was precisely the type of physical therapy that Taylor had been instructed to give by Foundling Hospital, Incarnation Children's Center, and/or Harlem Hospital that led to Gary's injuries. From the age of eight months, Gary received daily physical therapy in the form of manipulation of his arms and legs. The purpose of the therapy was to counteract the effects of arthrogryposis multiplex congenita. While Gary lived in Taylor's home, Taylor took Gary to physical therapy sessions at Harlem Hospital first once and then twice a week. Taylor also was instructed that Gary should receive therapy at home twice a day, and both she and her son Artnell performed this therapy. In her deposition, Taylor indicated that she asked the agency for help with Gary's physical therapy, but was not given any assistance. Taylor Dep. at 139. Taylor also stated that she was upset by the therapy that Harlem Hospital was performing on Gary and that she voiced this concern to the health coordinator, to Dr. Stephen Nicholas, and to Gary's social worker, Dana Carney. *Id.* at 140. However, according to Taylor, the therapist at Harlem Hospital directed her to continue with the therapy and not to "spoil" Gary. *Id.* at 100.

Taylor now suggests that the fractures revealed by the x-rays resulted directly from the therapy. According to the Family Court testimony of Dr. Kwame Ansane–Yeboa, arthrogryposis multiplex congenita makes bones more susceptible to fracture, and as a result, physical therapy prescribed for a child with arthrogryposis multiplex congenita must consist of "a careful set of exercises." Plaintiffs' Exh. Z at 14, 17. Dr. Ansane–Yeboa indicated that he thought the injuries reflected in Gary's x-rays were most likely caused by vigorous handling in physical therapy. *Id.* at 28–29. Taylor also suggests that any facial injuries that Gary sustained resulted from problems with the nebulizer mask that she had brought to the attention of Gary's social worker. Plaintiffs' Br. at 25; Plaintiffs' Exh. B at 14.

## STANDARD OF REVIEW

The principles governing the grant or denial of summary judgment under Fed. R.Civ.P. 56 are well established. "[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.), *cert. denied*, 524 U.S. 911, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998). In addressing a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir.1998) (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The party seeking summary judgment bears the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

While on a motion for summary judgment all facts must be construed in favor of the non-moving party, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In so doing, the "non-moving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998).

Moreover, while the party resisting summary judgment must show a dispute of fact, it also must be a material fact in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat a properly supported motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505. Instead, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Id.* at 256, 106 S.Ct. 2505. Summary judgment should only be granted if no rational factfinder could find in favor of the non-moving party. *Heilweil v.*

*Mount Sinai Hospital*, 32 F.3d 718, 721 (2d Cir.1994).

Rule 56(e) further provides that "[s]upporting and opposing affidavits shall be made on personal knowledge ... and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted).

## DISCUSSION

### I. § 1983 Claims

██ To state a cause of action under § 1983, a plaintiff must allege that the defendant has deprived him of a federal right while acting under color of state law. *See Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Plaintiffs allege that defendants violated their rights under the Fourth, Fifth and Fourteenth Amendments.[3] I address each of plaintiffs' claims in turn; first with respect to the caseworkers in their individual capacities and then as to the City of New York and the other defendants in their official capacities.[4]

---

**3.** Because the Fifth Amendment applies only to the federal government, allegations of "federal action" are required to state a claim for deprivation of due process in violation of the Fifth Amendment. *See Flowers v. Webb*, 575 F.Supp. 1450, 1456 (E.D.N.Y.1983). There are no such allegations in this case. Presumably in recognition of this legal principle, plaintiffs limit their arguments in opposition to the summary judgment motions to defendants' alleged violations of their constitutional rights under the Fourth and Fourteenth Amendments. *See Kia P. v. McIntyre*, 2 F.Supp.2d 281, 286 n. 2 (E.D.N.Y.1998).

**4.** While the complaint names Sabol and Little as defendants in both their individual and official capacities, plaintiffs have not presented any evidence to show that these defendants were personally involved in the alleged constitutional violations. *See Chayo v. Kaladjian*, 844 F.Supp. 163, 172 (S.D.N.Y.1994) ("A de-

fendant's personal involvement in an alleged constitutional violation is a prerequisite to the imposition of damages under section 1983. There are four ways in which a supervisory official may be personally involved in a 1983 violation: he may (1) have directly participated in the infraction or be directly involved through ordering that the action be taken; (2) have failed to remedy a wrong after learning of the violation; (3) have created or allowed a policy to continue under which the violation occurred; (4) have been grossly negligent in managing the subordinates who caused the violation.") (citation omitted); *Tenenbaum v. Williams*, 862 F.Supp. 962, 968 (E.D.N.Y. 1994) ("As individuals, [supervisors] can be liable only if they were personally responsible for violations of plaintiffs' rights, by, inter alia, promulgating unconstitutional policies or plans, or otherwise authorizing or approving the challenged misconduct."), *aff'd in rele-*

### A. Claims Brought Against the Caseworkers in Their Individual Capacities

#### 1. Due Process Claims

■ Plaintiffs first argue that in removing Tamika and Artnell from Taylor's custody, defendants deprived both Taylor and her children of due process of law. It is undoubtedly the case that under ordinary circumstances, Taylor, as a parent, has a liberty interest in the care and custody of her children, sometimes referred to as the right to "family integrity" or "the right of the family to remain together without the coercive interference of the awesome power of the state." *Joyner v. Dumpson,* 712 F.2d 770, 777–78 (2d Cir.1983) (quoting *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977)). Although some courts have questioned whether Tamika and Artnell, as children, should have a parallel liberty interest in remaining in the custody of their mother as opposed to that of the state, *see, e.g., Jordan v. Jackson,* 15 F.3d 333, 343 n. 10 (4th Cir.1994) (surveying decisions on this issue); *Donald v. Polk County,* 836 F.2d 376, 384 (7th Cir.1988) (suggesting without deciding that a child is not deprived of a liberty interest when custody is transferred from parents to the state), the Second Circuit's 1977 opinion in *Duchesne,* 566 F.2d at 825, suggests that they do. There, the court observed:

> [The] right to the preservation of family integrity encompasses the reciprocal rights of both parent and children. It is the interest of the parent in the companionship, care, custody and management of his or her children, and of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association, with the parent.

> This mutual interest in an interdependent relationship has received consistent support in the cases of the Supreme Court.

*vant part,* 193 F.3d 581 (2d Cir.1999). None of the ways in which a supervisory official may be personally involved has been pleaded

(internal quotations and footnote omitted); *see also id.* at 833 ("Ms. Perez and her two children were deprived of *their* right to live together as a family without due process of law.") (emphasis added).

■ However, substantive due process analysis is inappropriate where plaintiffs' claim is covered by the Fourth Amendment. *Tenenbaum v. Williams,* 193 F.3d 581, 599–600 (2d Cir.1999) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 853, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). That is so because "[w]here a particular Amendment provides an explicit source of constitutional protection against a particular source of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (internal quotations omitted). As discussed *infra,* plaintiffs' claims for Tamika's examination and the children's removal constitute a search and seizure, and are to be analyzed under the Fourth Amendment.

■ Plaintiffs also claim that they were deprived of procedural due process. It is well-established that a parent generally cannot be deprived of her interest in the custody of her children without due process, which generally requires a predeprivation hearing. *See Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987). However, it is equally well-established that there is no due process violation when a child is taken from a parent's custody without parental consent or a court order in *emergency circumstances. Id.* (it is "well established that officials may temporarily deprive a parent of custody in emergency circumstances without parental consent or a prior court order.") (internal quotations omitted); *see also Cecere v. City of New York,* 967 F.2d 826, 829–30 (2d Cir.1992); *Hurlman v. Rice,* 927 F.2d 74, 79 (2d Cir.1991).

here and the supervisors therefore are entitled to summary judgment as to the claims made against them in their individual capacities.

"Emergency circumstances" are defined as instances "in which the child is immediately threatened with harm, for example, where there exists an immediate threat to the safety of the child, or where the child is left bereft of care and supervision, or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence." *Hurlman*, 927 F.2d at 80 (internal quotations omitted). The question, then, is whether or not the circumstances in this case rise to the level of emergency proportions. I find as a matter of law that this question must be answered in the affirmative.

Plaintiffs do not dispute that Gary sustained serious injuries while in Taylor's care. They do not dispute that the pediatric radiologist who examined Gary's x-rays reported that the fractures were indicative of child abuse. Given this report, it was only reasonable for the CWA to fear that the other children who resided in Taylor's home, Tamika and Artnell, were at risk of imminent harm of a similar nature. These concerns were only heightened when Taylor was unable to offer any explanation for Gary's fractures. Indeed, even Taylor admits that she understood that her children were being removed because of the suspicious and unexplained injuries to their foster brother. *See* Taylor Dep. at 237 ("[CWA] wanted to make sure they were safe. Make sure what I did to Gary I didn't do to them."). Perceiving an imminent danger, Evans immediately made arrangements for the children's removal. *Cf. Tenenbaum v. Williams*, 193 F.3d at 595(emergency did not exist where caseworkers waited over one day to effectuate removal, during which time court order could have been procured: "The evidence suggests that the purpose of removing Sarah from school was not to sweep Sarah out of harm's way but rather to rule out the possibility that Sarah had been sexually abused.") (internal quotation omitted). Whatever the merits of the explanation that Taylor now offers for Gary's injuries, the Court finds, as a matter of law, that it was objectively reasonable for Evans to perceive that an emergency existed on July 28, 1990 and that, accordingly, plaintiffs' due process rights were not violated.[5] That assessment was in fact ratified by court order, further confirming its reasonableness. *Accord Simmons v. Chemung County Dep't of Soc. Services*, 770 F.Supp. 795, 801 (W.D.N.Y.1991) (drawing upon the established law of malicious prosecution cases, the court stated that "it is well settled that a presumption of probable cause arises where the evidence gathered by investigators is subsequently found by a neutral arbiter to justify the challenged state action"), *aff'd* 948 F.2d 1276 (2d Cir.1991).

Plaintiffs also suggest that even if emergency circumstances justified removing the children initially, procedural due process was violated because a hearing was not held sufficiently soon after the removal. Indeed, "in those extraordinary situations

---

**5.** Whether Evans himself actually believed the danger was imminent is not the relevant question. As Judge Leisure noted in *Chayo v. Kaladjian*, 844 F.Supp. 163, 169 (S.D.N.Y. 1994), "[t]o remove children, caseworkers need not 'believe' that child abuse is ongoing and that danger is imminent; caseworkers need only have been 'presented with evidence' of abuse and have 'reason to fear' that danger is imminent." (citation omitted). On the facts of this case, it is clear that the defendants were presented with evidence of abuse and had reason to fear that danger was imminent. *Id.; see also Robison v. Via*, 821 F.2d at 921 ("It is not necessary, for emergency circumstances to exist, that the child be harmed in the presence of the officials or that the alleged abuser be present at the time of the taking. Rather, it is sufficient if the officials have been presented with evidence of serious ongoing abuse and *therefore* have reason to fear imminent recurrence.") (citation omitted and emphasis added); *Schwimmer v. Kaladjian*, 988 F.Supp. 631, 640 (S.D.N.Y.1997) ("To remove Yoel, Guilford need only have been presented with evidence of abuse and *therefore* have reason to fear that danger is imminent.") (emphasis added), *aff'd*, 164 F.3d 619, 1998 WL 708818 (2d Cir.1998). Because defendants were presented with evidence of the serious abuse of one of the children in Taylor's household, they therefore had reason to fear that the other children in the household were in imminent danger of similar abuse.

where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed." *Duchesne,* 566 F.2d at 826 (internal quotations omitted).

In this case, however, a hearing was held promptly, in accordance with the requirements of due process. Tamika and Artnell were removed from their mother's custody for only four days before Judge Gage of New York County Family Court conducted a preliminary hearing. During the four-day period, the CWA honored Taylor's request that the children be placed with their maternal grandmother. This short-lived and relatively non-disruptive removal did not violate due process. *See Cecere,* 967 F.2d at 830 (citing *Duchesne*'s "explicit recognition that temporary assertions of custodial authority in the face of a reasonably perceived emergency do not violate due process" and finding no violation of due process where an assertion of custody in the face of an emergency situation lasted up to four days and completely denied the mother contact with her children); *van Emrik v. Chemung County Dep't of Social Services,* 911 F.2d 863 (2d Cir.1990) (holding that eight-day delay in providing adversarial hearing did not deny due process); *Dietz v. Damas,* 932 F.Supp. 431 (E.D.N.Y.1996) (twelve calendar day delay in providing an adversarial hearing did not deny due process), *decision aff'd,* 948 F.Supp. 198 (E.D.N.Y. 1996).

Finally, plaintiffs argue that the removal of Tamika and Artnell pursuant to a court order on August 3, 1990 violated their due process rights. Plaintiffs allege that, in making that order, the court relied upon false information provided by defendant Ramona Pinckney. In her report, Pinckney stated that Taylor failed to cooperate with the CWA's investigation by refusing to authorize x-rays of the children. Plaintiffs contend that this statement is inconsistent with a case narrative record indi-

cating that a physician from St. Luke's Hospital concluded that x-rays of the children were not necessary. This is a dispute of fact; but it is not a dispute of a material fact. The children's removal was based upon evidence that one of the children in the household had been injured in a manner suggesting abuse. The Family Court judge held that the nature and severity of Gary's injuries alone provided a sufficient basis for the removal of Artnell and Tamika from Taylor's home.

In any event, the individual defendants in this case enjoy qualified immunity, and under that standard, the claims brought against them must be dismissed.

■ Qualified immunity doctrine protects the exercise of discretion in an effort to promote the "public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotations omitted). The Supreme Court has directed that issues regarding qualified immunity "should be resolved at the earliest possible stage of a litigation." *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

■ Caseworkers in § 1983 actions enjoy qualified immunity from liability for damages if at the time of the pertinent episode it was not clear that the actions they took violated established constitutional rights, or if it was objectively reasonable for them to believe that their actions did not violate such rights as were then clearly established. *van Emrik,* 911 F.2d at 865–66 (citing *Robison v. Via,* 821 F.2d at 920–21). The latter ground "may lead to summary judgment if the defendant adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ] to believe that he was acting in a fashion that did not clearly

violate an established federally protected right." *Robison v. Via*, 821 F.2d at 921 (internal quotations omitted). A defendant is entitled to qualified immunity even if officials "of reasonable competence could disagree" that the acts in question were objectively reasonable. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Schwimmer v. Kaladjian*, 988 F.Supp. 631, 639–40 (S.D.N.Y. 1997) (citing *Malley* and *van Emrik* and stating that "[t]he question is not whether [the caseworker] pursued the best course of action with respect to the . . . children, but whether it was objectively reasonable for the him to believe that his actions did not violate the plaintiffs' constitutional rights that were clearly established at the time"), *aff'd* 164 F.3d 619, 1998 WL 708818 (2d Cir.1998). As the Second Circuit explained in *van Emrik*:

> Though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective services caseworkers to choose between difficult alternatives in the context of suspected child abuse. If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it. . . . The issue is not whether it was absolutely essential to

remove the child . . . . The issue is whether it was objectively reasonable for the defendants to make the decision that they made, and no rational jury could find that it was not.

911 F.2d at 866.

 In this case, I have already held that the threat to the health and safety of Tamika and Artnell perceived by the caseworkers[6] rose to emergency proportions and that they were not violating plaintiffs' clearly established rights in removing them on those grounds. It also was an objectively reasonable assessment.[7] This analysis is not undertaken in hindsight but is determined by examining the defendants' actions in the context of "the circumstances with which [they were] confronted." *Giacalone v. Abrams*, 850 F.2d 79, 85 (2d Cir.1988) (internal quotations omitted). At the time of Evans' investigation, given the serious injuries sustained by a child under Taylor's care, the absence of a consistent explanation to explain those injuries, and the existence of an unbiased, specific report citing fear of child abuse, it was not unreasonable for him to believe that Gary had been abused and that the other two children in Taylor's care also might be at risk. *See, e.g., Chayo v. Kaladjian*, 844 F.Supp. at 169 ("This Court concludes that the examination of the Chayo children was objectively reasonable in light of the Report."). As noted above, the reasonableness of that belief (and the absence of clearly established rights indicating otherwise) is corroborated by the Family Court's order removing the children on an emergency basis. Any rights

---

6. Although plaintiffs also implicate defendant Pinckney, the thrust of their claim is directed at defendant Evans. They have presented no evidence tending to show that Pinckney's actions were unreasonable; therefore she too is entitled to qualified immunity.

7. The two analyses, although similar, are distinct. As the Second Circuit recently has had occasion to say, "constitutionality in this area depends on whether there was a reasonable basis for a finding of abuse, whereas immunity of course depends on a reasonableness

determination as well." *Wilkinson v. Russell*, 182 F.3d 89, 107 at n. 10 (2d Cir.1999). The distinction is that "there is a difference between finding a reasonable basis for an abuse determination and evaluating whether it was objectively reasonable for a case worker to believe that such a basis existed. The former depends on the facts and events of a particular case, whereas the latter depends on the clarity of existing law at the time of those events." *Id.*

that plaintiffs may have had not to be removed in those circumstances were, as a matter of law, not clearly established at the time of the events here in question. *See Tenenbaum v. Williams,* 193 F.3d at 595–96 (law relating to emergency removal by caseworkers not clearly established in 1990). Accordingly, even if there were a material issue of fact as to these claims, the individual defendants nonetheless are entitled to summary judgment on qualified immunity grounds.

2. *Fourth Amendment Claims Arising from the Removal of the Children and the Physical Examination of Tamika*

■ Plaintiffs next allege that defendants violated their Fourth Amendment rights by removing the children and by visually examining Tamika. The Second Circuit recently has held that the state's assumption of custody to protect a child constitutes a seizure under the Fourth Amendment. *Tenenbaum v. Williams,* 193 F.3d 581, 593. In these circumstances, such a Fourth Amendment analysis results in a test similar to that used for the due process issues. *See id.* at 593–597.

Although it is now clear that the removal of a child indeed constitutes a seizure under the Fourth Amendment, it is unclear under what circumstances a removal would violate the Fourth Amendment. In *Tenenbaum,* the Second Circuit declined to hold "categorically ... that the removal of a child of whom abuse is suspected is not a 'special needs' situation' ... in which the law of warrant and probable cause established in the criminal setting does not work effectively in the child removal or child examination context." *Id.* at 604.

In the present case, even assuming the necessity of a probable cause requirement, that standard was met; accordingly, plaintiffs' Fourth Amendment rights were not violated by the children's removal.[8] It was Foundling Hospital, a neutral third party, which initially filed the report of suspected child abuse as required under New York law, thereby prompting CWA's investigation. *See* Defendants' Exhs. A–C. Dr. Abramson, a pediatric radiologist who examined Gary's x-rays, reported that the fractures were indicative of child abuse. Gary's attending doctor confirmed that the evidence was consistent with physical abuse. *See* Nicholas Dep. at 98. Other district courts in the Second Circuit have held that a report "filed by an identified, disinterested person with cause to know of abuse and a legal obligation to report it, confirmed by the treating resident physician, constitutes objectively reasonable evidence of an emergency to child protective personnel." *Dietz,* 932 F.Supp. at 445; *see also Yuan v. Rivera,* 48 F.Supp.2d 335, 345 (S.D.N.Y.1999) (same).

■ Alternatively, as above, the individual defendants in this case are entitled to qualified immunity. They are entitled to immunity for two reasons. First, they are entitled to immunity because the application of the probable cause and warrant requirements to child abuse investigations by caseworkers was unsettled at the time of defendants' actions. *See Tenenbaum,* 862 F.Supp. at 976–77 ("the individual defendants in this case are entitled to qualified immunity because the application of the probable cause and warrant requirements to child abuse investigations was unsettled at the time of defendants' investigation"), *aff'd in relevant part,* 193 F.3d 581.[9] Second, even if the general princi-

8. A warrant is not required where emergency circumstances are present; and I already have held that they were. *See Tenenbaum,* 193 F.3d at 604 ("it is core Fourth Amendment doctrine that a seizure without consent or a warrant is a reasonable seizure if it is justified by exigent circumstances") (internal quotations omitted).

9. In *Tenenbaum,* 862 F.Supp. at 977, the district court drew an important distinction in this regard:

While the Courts in *Franz v. Lytle,* 997 F.2d 784 (10th Cir.1993), and *Good v. Dauphin County Social Servs.,* 891 F.2d 1087, 1094 (3d Cir.1989), held that Fourth Amendment jurisprudence was sufficiently well devel-

ples of law were sufficiently defined in July and August of 1990 to place potential defendants on notice, the individual defendants here would still be immune from civil liability because, as stated *supra,* it was "objectively reasonable for them to believe they violated no . . . [Fourth Amendment] rights when they seized" the children. *Robison,* 821 F.2d at 921.

Plaintiffs also argue that Tamika's Fourth Amendment rights were violated when Evans physically examined her. Although defendant Evans denies that he removed Tamika's clothing, *see* Evans Dep. at 83, I must credit for purposes of this summary judgment motion Taylor's sworn statement that Evans "pulled up the oversized T-shirt Tamika was wearing and exposed her back" and "pulled down Tamika's underpants and exposed her buttocks." Taylor Aff. ¶¶ 7, 8; *see also* Taylor Dep. at 211 ("That's what he said. Hurry up take Tamika's clothes off, to check her butt and back. As he's making his call [to his supervisor] standing in the kitchen taking my daughter's clothes off so he can examine her.").

In *Tenenbaum,* the Second Circuit explicitly held that such searches are to be analyzed under the Fourth Amendment. 193 F.3d at 604–05. *See also Schwimmer v. Kaladjian,* 164 F.3d 619, 1998 WL 708818, at *2–3 (2d Cir.1998) (plaintiff's Fourth Amendment "claim depends upon the existence of the evidence that the x-rays were performed for investigative purposes, rather than because the treating physicians believed that they were medically necessary.") (unpublished disposition). In *Schwimmer,* the court stated that "the policy of photographing potentially abused children . . . raises concerns under the Fourth Amendment, which protects a child's legitimate expectation of privacy and personal security from unreasonable government searches." *Id.* at *3.

■■■■■ From *Tenenbaum* and *Schwimmer,* it is clear that a strip search of a child implicates the child's Fourth Amendment interests, at least when the search serves an investigative function. Citing to *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the Second Circuit in *Schwimmer* noted that the applicable standard was one of reasonableness. 164 F.3d 619, 1998 WL 708818, at *3. In *T.L.O.,* the Supreme Court noted:

> Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place. The determination of the standard of reasonableness governing any specific class of searches requires balancing the need to search against the invasion which the search entails. On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order.

469 U.S. at 337, 105 S.Ct. 733 (internal quotations omitted). Noting that "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance," the Supreme Court has held that "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individual-

---

oped to place persons investigating child abuse on notice of its applicability to their work, those cases involved searches or seizures by or with the participation of police officers, whose conduct is regularly governed by the Fourth Amendment. By contrast, in *Landstrom v. Illinois Dep't of Chil-*

*dren & Family Servs.,* 892 F.2d 670, 676–77 (7th Cir.1990), and *Darryl H. v. Coler,* 801 F.2d 893, 908 (7th Cir.1986), the Seventh Circuit held that caseworkers were immune from claims under the Fourth Amendment because its application to child abuse investigations was unsettled.

ized suspicion in the particular context." *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665–66, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (discussing administrative searches) (cited in *Franz v. Lytle*, 997 F.2d 784, 788 (10th Cir.1993)). *But see* Steven F. Shatz et al., *The Strip Search of Children and the Fourth Amendment*, 26 U.S.F. L.Rev. 1, 35 (Fall 1991) (arguing that there should be no administrative exception to traditional Fourth Amendment analysis for child abuse investigations).

Several other circuits have considered the Fourth Amendment implications of strip searches in child abuse investigations. In *Darryl H. v. Coler*, 801 F.2d 893, 899–903 (7th Cir.1986), the Seventh Circuit considered whether a district court had abused its discretion in refusing to grant a preliminary injunction prohibiting the Illinois Department of Children and Family Services from using a procedure permitting caseworkers to physically examine children for evidence of abuse under certain circumstances. The Seventh Circuit concluded that in the context of a department procedure aimed primarily at protecting children rather than at criminally prosecuting parents, "we cannot say that the Constitution requires that a visual inspection of the body of a child who may have been the victim of child abuse can only be undertaken when the standards of probable cause or a warrant are met." *Id.* at 902. *See also Wildauer v. Frederick County*, 993 F.2d 369, 373 (4th Cir.1993) (same).

The other circuits considering strip searches as part of child abuse investigations have done so in cases where the police were involved in the strip search. In *Good v. Dauphin County Social Servs.*, 891 F.2d 1087 (3d Cir.1989), the Third Circuit denied qualified immunity to a police officer and a social worker who forcibly entered an apartment to investigate an anonymous tip received twenty hours earlier that the plaintiff's child may have been the victim of abuse. Upon entering, the two defendants proceeded to strip search the seven year old child. The Third Circuit held that "[t]he decided case law [in April 1987] made it clear that the state may not, consistent with the prohibition of unreasonable searches and seizures found in the Fourth and Fourteenth Amendments, conduct a search of a home or strip search of a person's body in the absence of consent, a valid search warrant, or exigent circumstances." *Id.* at 1092.[10] The court rejected defendants' argument that "they were entitled to assume until told otherwise by the courts that child abuse cases would not be controlled by the well established legal principles developed in the context of residential intrusions motivated by less pressing concerns." *Id.* at 1094. In distinguishing *Darryl H.*, the Third Circuit noted that "the propriety of the strip search cannot be isolated from the context in which it took place" and that unlike *Darryl H.*, the defendants in *Good* had forcibly entered the home to conduct an investigative search and had not acted pursuant to a procedure provided to them by their superiors. *Id.* at 1096 & n. 6.

In *Franz v. Lytle*, 997 F.2d 784 (10th Cir.1993), the Tenth Circuit denied qualified immunity to a defendant police officer who, without a warrant, photographed and physically examined a two year old child's genitals in the course of a child abuse investigation. The court noted that it had never decided "whether social workers are relieved of the probable cause or warrant requirement when investigating cases of child abuse or neglect" based on the Supreme Court's administrative search cases. *Id.* at 788 and at 788 n. 8. The court concluded, however, that it need not decide that question, because

[w]hat the district court perceived, and what cannot be overlooked, is that de-

---

**10.** The court was careful to elaborate that, where exigent circumstances do exist, a war-rant is not required. *See id.* at 1094 n. 2.

fendant's focus was not so much on the child as it was on the potential criminal culpability of her parents. That focus is the hallmark of criminal investigation. In contrast, a social worker's principal focus is the welfare of the child. While a criminal prosecution may emanate from the social worker's activity, that prospect is not a part of the social worker's cachet. This distinction of focus justifies a more liberal view of the amount of probable cause that would support an administrative search.

*Id.* at 791.

In *Calabretta v. Floyd*, 189 F.3d 808 (9th Cir.1999), the Ninth Circuit also distinguished *Darryl H.* The court noted that in *Darryl H.*, "the strip search was not done during an unconstitutional entry into the home, and the information supporting a strip search was much stronger . . . than in the case at bar," in which the social worker, acting on a "weak tip," had "little reason to believe" that the child had been abused. *Id.* at 818-819, 820.

■■■ On the facts of this case, I think it clear that the defendants are entitled to summary judgment on the basis of qualified immunity. First, in this case, there was no police involvement or coerced entry. The court in *Calabretta* noted the significance of the fact that, as in *Good* but as distinguished from *Darryl H.*, the search conducted by the police and accompanying social worker could not "be separated from the context in which it took place, the coerced entry into the home." 189 F.3d at 819. *See Good*, 891 F.2d 1087, 1096 ("the strip search in this case came in the context of a forced entry into a residence in the middle of the night. On these facts, the degree of intrusion of privacy was not at all comparable to the far more limited intrusion in *Coler*"); *Franz*, 997 F.2d at 791 ("defendant's conduct cannot

otherwise be transformed into that of a social worker given the uncontroverted facts he was in uniform and carrying a gun at all times"). In the instant case, Taylor willingly admitted a social worker (unaccompanied by law enforcement) into the family home.[11] Significantly, the search was done for protective purposes (the province of social workers) and not for investigative purposes (the function of law enforcement), a distinction made in all of the cases discussed *supra.*

Second, in this case, the search did not involve touching, photography, or sustained examination of sexual body parts. In *Tenenbaum v. Williams*, 862 F.Supp. 962, in which the court held that a non-emergency, warrantless body cavity search of a suspected child abuse victim violated the Fourth Amendment, it was careful to distinguish visual inspections from invasive inspections of sexual organs for investigative (as opposed to medical or protective) purposes. *Id.* at 978 ("Requiring a warrant for a mere visual inspection (following an emergency removal based on probable cause)—particularly of asexual parts of the anatomy—could frustrate child welfare workers in their efforts to uncover child abuse by converting a quick inspection into a time-consuming procedure")*aff'd in relevant part*, 193 F.3d 581. *See also Franz*, 997 F.2d at 791.

Third, Tamika, the child searched, was only three years old at the time of the incident complained of. In *New Jersey v. T.L.O.*, 469 U.S. 325, 342, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the Supreme Court indicated that age was an appropriate consideration in determining the reasonableness of a school official's strip search of a student. A recent law review article gives more lengthy consideration to the relevance of age in strip searches. It notes that

11. *See* Evans's statement. Dep. at 73:18–21 ("When I arrived at Miss Taylor's home, I knocked on the door, and I identified myself as a CWA worker, and she stated she had been expecting me and invited me into the home."). Taylor disputes only whether she had been expecting Evans or not. Taylor Aff. at § 2; Dep. at 201. She does not deny having admitted him into her home.

the impact of a strip search on a child will depend, at least in some cases, on the child's age. While one might be tempted to assume that strip searches cause less trauma to older children, if studies of child sexual abuse are any guide, there is no basis for such an assumption. Although the results of these studies have not been entirely consistent, several suggest that the impact of sexual abuse on adolescents and on school age children is greater than on young children. As a result, they may experience strip searches as more humiliating and embarrassing than other victims. School age children have also developed body autonomy—they no longer need adults to dress and bathe them. In fact, school age children need a measure of privacy to mature in a healthy manner, and threats to that privacy function as threats to their self-esteem. By contrast, taken as a group, young children suffer less trauma from strip searches. Infants and younger children within this group suffer little or no trauma since they necessarily have not yet developed a real sense of body autonomy and personal privacy—they are still bathed and dressed by the adults with whom they live, and even caretakers and pre-school teachers have occasions to help them dress. Also, they are not likely to understand the taboos against undressing in front of strangers to the same extent as older children, and 'activities undertaken under the cloak of innocence do not cause so much pain.' Older children within this group (five and six year-olds) enjoy a better developed sense of autonomy and privacy and, as a result, may experience substantial trauma from strip searches. However, because these children still operate on the basis of unquestioned response to adult authority, they are likely to feel the violation of that autonomy and privacy to a lesser degree than would adolescents and school age children.

Shatz, *The Strip Search of Children*, 26 U.S.F.L.Rev. at 17–18. Tamika was only three years old at the time of the inspection, and Evans inspected her back and buttocks only visually.

For the foregoing reasons, the facts of this case more closely resemble those in *Darryl H.* than they do those in the other cases discussed and the defendants therefore are entitled to qualified immunity.

Moreover, as above, qualified immunity would apply in any event because the state of the law was unsettled at the time of the events here at issue. *See van Emrik* (finding individual defendants immune because law was unsettled); *Tenenbaum*, 862 F.Supp. at 973 (granting summary judgment on the basis of qualified immunity because the "events at issue in the present case ... occurred when the law ... was not settled" in January of 1990), *aff'd in relevant part*, 193 F.3d 581. The law was no more settled in July 1990 when the events on this case occurred;[12] accordingly, the defendants are entitled to summary judgment as to this claim as well.

### 3. *Malicious Prosecution Claims*

■■ Plaintiffs next assert claims for malicious prosecution both as to the family court proceedings and as to the criminal proceedings. The Second Circuit has stated that:

[t]hough section 1983 provides the federal claim, we borrow the elements of the underlying malicious prosecution tort from state law. In New York, a plaintiff alleging malicious prosecution must show: (1) the defendant commenced a criminal proceeding against him; (2) the proceeding ended in the plaintiff's favor; (3) the defendant did not have probable cause to believe the plaintiff was guilty of the crime charged; and (4) the defendant acted with actual malice.

12. Indeed, even if *van Emrik* may be said to squarely govern this case—which I do not say

here—that case was not decided until after the events at issue already had transpired.

*Cook v. Sheldon,* 41 F.3d 73, 79 (2d Cir. 1994).

■ Contrary to defendants' assertion that "plaintiff cannot establish malicious prosecution because a Family Court proceeding is not a criminal proceeding," Br. at 17, it is not clear that such a claim is unavailable for child abuse proceedings. In *Easton v. Sundram,* 947 F.2d 1011, 1018 (2d Cir.1991), the Second Circuit characterized this issue as one of first impression and stated, "we do not hold that civil malicious prosecution can never give rise to a cause of action under § 1983, although we suspect it normally will not" (collecting cases and stating that "[t]o our knowledge, no other court to have considered the question has held that a cause of action pursuant to section 1983 for malicious civil prosecution exists," *id.* at 1017). The Second Circuit has thus left open the rather narrow possibility that a civil malicious prosecution may conceivably rise to constitutional dimensions. Indeed, Magistrate Judge Francis of this District did allow for that very possibility in *Yuan v. Rivera,* 48 F.Supp.2d at 349, holding that "the groundless initiation of a case in Family Court may give rise to a claim for malicious prosecution" under § 1983.

However, in the case at bar, as set forth *supra,* plaintiffs were not "subjected to 'conscience-shocking' behavior that would transform [any] state cause of action into a constitutional one" nor were they "subjected to a misuse of the legal process so egregious as to work a deprivation of a constitutional dimension." *Easton,* 947 F.2d at 1018. *See also Zanghi v. Incorporated Village,* 752 F.2d 42, 45 (2d Cir.1985) ("It is abundantly clear that a finding of probable cause will defeat state tort claims for ... malicious prosecution"). Accordingly, their claims for malicious prosecution in the Family Court proceedings must be dismissed.

■ Plaintiffs' claims for malicious prosecution with regard to the criminal proceedings also must be dismissed. As stated above, plaintiffs must demonstrate, among other things, a favorable termination on the merits. Taylor was convicted by a jury of two counts of assault in the second degree and one count of endangering a child. That verdict was reversed on the basis of the trial court's error in responding to jury notes without first showing them to Taylor's counsel.

Recognizing that in certain instances, "criminal proceedings are terminated in a manner that does not establish either guilt or innocence," the Second Circuit has held that "[i]n the absence of a decision on the merits, the plaintiff must show that the final disposition is indicative of innocence." *Russell v. Smith,* 68 F.3d 33, 36 (2d Cir. 1995). Plaintiffs have not shown that the ultimate disposition of the criminal case against Taylor was "indicative of innocence," particularly given the Appellate Division's statement that "[t]he evidence was legally sufficient to establish [Taylor's] guilt, and the verdict was not against the weight of the evidence." *People v. Taylor,* 192 A.D.2d 35, 597 N.Y.S.2d 347, 348.

Further, plaintiffs have not shown that defendants had anything whatever to do with the District Attorney's decision to prosecute Taylor. Assistant D.A. Riccardi testified that none of the defendants encouraged her to press charges and Detective Flaherty testified that his decision to arrest Taylor was based upon information derived from his interview with Dr. Nicholas (who is no longer a defendant in this action), discussions with the D.A.'s office, and an interview with Taylor. Accordingly, the first prong of the malicious prosecution test also has not been satisfied. Plaintiffs' malicious prosecution claims are dismissed.

**B.** *Claims Brought Against the City of New York and the Other Defendants in Their Official Capacities*

■ The claims brought against defendants Sabol, Little, Evans, and Pinckney in their official capacities are the equivalent of claims against the City of

New York. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Tenenbaum,* 862 F.Supp. 962, 969. "Qualified immunity is not a defense to a claim against a municipal official in his official capacity." *Frank v. Relin,* 1 F.3d 1317, 1327 (2d Cir.1993).

> To prevail against municipal defendants, a section 1983 plaintiff must prove the existence of a municipal policy or custom that caused his injuries and, second, plaintiff must establish a causal connection ... between the policy and the deprivation of his constitutional rights. The threshold question is whether there has been a deprivation of a constitutional right.

*Chayo v. Kaladjian,* 844 F.Supp. 163, 170–71 (internal quotations omitted).

> [C]laims brought under section 1983 require specific allegations at the pleading stage and thus represent a departure from the liberal pleading requirements set forth in Rule 8(a). Accordingly, this Court has repeatedly held that the allegation of one incident is insufficient to maintain a claim against a municipality.

*Id.* at 172 (internal citations omitted). *See also City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412; *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion); *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The inference that the violation of a plaintiff's constitutional rights resulted from a municipal custom or policy such a policy existed may arise from "circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991).

As shown above, plaintiffs have failed to establish any legally cognizable federal claims against any of the individual defendants or municipal employees. Accordingly, no claims can lie against the municipal defendant. *See, e.g., City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). Plaintiffs' *Monell* claims are dismissed.

## II. *State Law Claims*

Insofar as plaintiffs have failed to state a federal claim, this Court will not exercise pendent jurisdiction over plaintiffs' state law claims. *See Dunton v. County of Suffolk,* 729 F.2d 903, 910–11 (2d Cir.1984) (pendent jurisdiction proper only where federal claims are substantial).

## III. *Conclusion*

For the foregoing reasons, plaintiffs' claims are dismissed in their entirety against all of the defendants.

It is SO ORDERED.