**Florence McSWEEN, Plaintiff,**

v.

**Shirley EDWARDS, individually and as caseworker for the Administrator for Children's Services, Barbara Felton, individually and as manager for the Children's Services, Kathryn Croft, individually and as Deputy Commissioner of Social Services, Marva Hammons, individually and as Commissioner of Social Services, Edward Ferrington, individually and as officer of the New York City Police Dept., Carl Thomas, individually and as officer of the New York City Police Dept., William J. Bratton, individually and as Commissioner of the New York Police Dept., and City of New York, Defendants.**

**Florence McSween, Plaintiff,**

v.

**Lynette Lipsey, individually and as supervisor for the Administration for Children's Services, and Morris Simonowitz, individually and as supervisor for the Administration for Children's Services, Defendants.**

**Nos. 96 CV 5094, 98 CV 915.**

United States District Court,
E.D. New York.

March 29, 2000.

Carolyn A. Kubitschek, Lansner & Kubitschek, New York City, for plaintiff.

Anna Henrietta Zetlin, City of New York Law Dept., New York City, for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff Florence McSween brings suit under 42 U.S.C. § 1983 against defendants Shirley Edwards, Barbara Felton, Kathryn Croft, Marva Hammons, Edward Ferrington, Carl Thomas, William Bratton, the City of New York, Lynette Lipsey, and Morris Simonowitz, alleging that their actions violated her constitutional rights. Plaintiff also brings various state law claims for false arrest and imprisonment, malicious prosecution, and negligence. Defendants move for summary judgment under Federal Rule of Civil Procedure 56.

### I

The record, in substance, shows the following.

Plaintiff Florence McSween is the mother of Anellee McSween ("Anellee"), who was born on November 7, 1982. In the summer of 1995, plaintiff sent her daughter Anellee, then twelve, to visit relatives in Grenada. While in Grenada, Anellee wrote a five-page, handwritten letter dated July 28, 1995, that was forwarded to the Grenada Social Service Department. The letter recited in detail allegations that her mother and older sister Danielle McSween

beat her, and described numerous miseries of her home life.

The letter explains, among other things: "My mother constantly beats me often with different objects. Sometimes she beats me with a pot, spoon, her hand and a cord.... My mother stuffs my mouth with a rag or some sort of material so that I will not cry loud or scream so the other tenants will not hear and call police, she also puts the radio very high.... She has threatened me in many different sorts of ways[,] for example 1) I'll kill you[,] 2) I'll drive into the woods, leave you and go ... 6) I'll hold you in your throat and choke you to death.... My mother also gets my sister to hit on me; especially when she is not home.... [My sister] hits me all over my body." The letter also states that her mother would lock her in her bedroom and beat her if she failed to finish her homework by a certain time, that she would receive beatings for failing to keep their home sparkling clean, and that her sister has attempted suicide and had run away several times.

By letter dated August 11, 1995, Roma Finlay, Chief Welfare Officer of the Grenada Social Service Department, referred the investigation into Anellee's alleged abuse to the Child Welfare Administration ("Children's Services") in New York, now known as the Administration for Children's Services ("Children's Services"). The letter states that "Anellee McSween has encountered verbal and physical abuse by her mother for quite a long time. She was eventually 'dumped' in Grenada to live under very inhumane conditions as a form of punishment."

Accompanying Finlay's letter was the investigatory file on Anellee, which included, among other things, an attached "Report From Social Services Department" ("Grenada Report") and a doctor's report. The Grenada Report explained that Anellee has numerous relatives in Grenada, but "only her grandfather knew that she was coming.... Her grandfather—Mr. Anthony Hillaire ... is seventy-six years old.

He is a farmer by profession.... Although he has a very good financial background, he lives under very primitive conditions.... Mr. Hillaire lives in his house with one grandson. Anellee occupied the same room with her grandfather. She complained that her grandfather gave her iced tea on mornings and only cook staples [sic] with very little protein.... Although there was an aunt who lived close by, she was not allowed to visit her.... Mr Hillaire awakes Anellee out of her bed by 4:00 a.m. to ... go to the field." Anellee said that her "chores included cutting bushes, cutting sugar cane, harvesting nutmegs and coca. Her recreation was accompanying her grandfather to the market place to [sell the] produce from the land."

According to the Grenada Report, Anellee's grandfather brought her to a local hospital because she was experiencing abdominal pain apparently caused by stress from her "inhumane conditions," "lack of proper food," and "a cyst ... on one of her ovaries." At the hospital, Anellee "made it quite clear to the Social Worker that she did not want to return to her grandfather's house and if she is sent there ... she will commit suicide. We therefore contacted her aunt—Mrs. Iva Campbell ... who agreed to take her niece to live with her until arrangements can be made to have her reunited with her mother."

The doctor's report accompanying Finlay's letter states that "[l]ike her [18 year] old sister, [Anellee] seems to have made attempts to take her own life. She also speaks and acts in a manner suggestive of more exposure than her age." The report noted that Anellee had her first "sexual experience" when she was only 10 years old.

According to the Grenada Report, when Anellee's mother, Florence McSween, arrived in Grenada on July 26, 1995, a "meeting was arranged with her but she was very rude, uncooperative and abusive to the extent that the Security had to escort her out of the office." The Grenada Re-

port also states that "[i]t was further discovered that although Anellee McSween is scheduled to leave Grenada on 4th September, 1995, her mother had no intention of taking her back to the U.S.A." While in Grenada, the authorities and Florence's sister, Campbell (or "aunt"), prevented Florence from seeing her daughter, who was staying with Campbell.

As plaintiff describes it, after "spen[ding] a harrowing month in Grenada contending with false child abuse allegations," she managed to leave Grenada with Anellee and returned to New York in mid-August.

On September 27, 1995, defendant Shirley Edwards, the caseworker from Children's Services assigned to investigate the child abuse allegations, telephoned Public School 6 ("P.S.6") to look for Florence, who worked there as a fifth-grade teacher. She was teaching a class when Edwards called, so Edwards left a message. Florence says she called back later that day, spoke with Edwards, and offered to bring Anellee in to Children's Services. Defendants say that Florence spoke with defendant Barbara Felton, Edwards' supervisor, and told Felton that she would call Edwards before noon the next day. She says she telephoned Edwards the next day several times but "each time was told that Edwards was not available."

Two days later on September 29, 1995, Edwards telephoned Florence at P.S. 6 again, and they spoke. According to defendants, Florence explained that she would not divulge her home phone number or home address out of fear for her daughter's life. She expressed concern that her sister Campbell and the Grenadian government would find out her home telephone number and home address. Florence said she would allow Edwards to see her children and would speak with her further only in the presence of her attorney.

On October 4, 1995, Rodney Sindbas, Esq., retained by Florence as an attorney, called Edwards and told her that he advised Florence not to cooperate with Children's Services until it provided a written statement promising that it would not reveal information to the Grenadian government. Edwards responded that if Florence continued with her refusal to cooperate, she would petition the family court for a warrant requiring her to produce Anellee.

On October 5, 1995, Florence called Edwards and reiterated her demand for a letter guaranteeing that Children's Services would not reveal information to the Grenadian government. Edwards would not offer any such assurances. During the ensuing conversation, the contents of which are disputed, defendants say Florence informed Edwards that her address was "3901 Nostrand Avenue, # 6–AG."

Later that day, Edwards visited "3901 Nostrand Avenue" but the building directory listed only single letter apartments. Edwards spoke with tenants in apartments 6A and 6G, but they had never heard of Florence McSween. According to Florence, she says a mis-communication created the confusion over her address and that she mixed up the letters to her building and apartment when telling Edwards her address.

After repeated failed attempts to find and meet Florence, Edwards filed a petition with the Brooklyn Family Court on October 10, 1995, alleging, "upon information and belief," that Anellee "is a neglected child" and "has been impaired or is in imminent danger of becoming impaired as a result of [Florence's abuse or neglect]," and that Florence "refused to cooperate" with the Children's Services investigation.

Through Children's Services' counsel, Edwards also requested the family court judge to issue a warrant for the production of Anellee. Edwards explained to the court that the "Respondent Mother has been evading—she did not want to disclose her present whereabouts. We know where she works, we don't know where she resides with the subject child and at this time, I did not think the service on the

Respondent Mother to produce the child ... [would] be effective." The court issued the warrant.

On October 11, 1995, Edwards delivered the warrant to the 72nd Precinct and asked the police department to serve it on Florence at P.S. 6.

On or about October 12, 1995, defendant Police Officer Edward Ferrington telephoned Florence and informed her about the warrant. He advised her that she could have the warrant vacated if she voluntarily surrendered by going to Brooklyn Family Court. He also told her to give him a return phone call after she had appeared in court. In his deposition, Ferrington explained that he called Florence because he knew her from his community policing beat. They had brief conversations before, mostly "about conditions on the beat, the neighborhood, [and] the weather," and so Ferrington thought "it would be a courteous thing to do to have [Florence] take care of the warrant on her own."

On October 16, 1995, Florence, accompanied by attorney Sindbas, voluntarily surrendered at the Kings County Family Court and the Family Court judge vacated the warrant. Because Florence did not bring Anellee with her, the judge adjourned the proceedings until October 31, 1995, and ordered Florence to bring her daughter then. Florence never called Ferrington after the proceeding.

The next morning at around 9:00 a.m., on October 17, 1995, Ferrington says that he telephoned the Brooklyn Family Court from a "pay phone in Georgia's restaurant" and asked Ms. Lohoma, a clerk in the records room, to perform a computer check on the warrant. According to Ferrington, Ms. Lohoma checked the computer and told him that it was still valid.

After Ferrington's alleged call to the courthouse, Ferrington and Thomas then drove to P.S. 6 to find Florence and confronted her inside the school. She asked them to "check the status of the warrant."

Ferrington responded that he had already done so and told her the warrant was still valid. After this brief conversation, they arrested Florence and then drove her to the Brooklyn Family Court.

When they pulled up to the courthouse, defendants say Florence mentioned for the first time that she had appeared at the Brooklyn Family Court the previous day. Ferrington then went to the courthouse's records room and asked the clerk to manually check her family court file, while plaintiff waited in the car with Thomas. The clerk told Ferrington that the warrant had been vacated the previous day, but because it was done at the end of the previous day it would not be processed into the computer system until the next morning. Thus it should have been entered in the computer that morning of the day of the arrest. When Ferrington returned to the police car, he informed Florence that the warrant had been vacated and drove her back to P.S. 6.

Florence's account of the events differs in several important ways. She claims that she told Ferrington and Thomas when they confronted her "that I went downtown yesterday and I spent the entire day at the family court." She says they refused to call and told her that their "job is only arresting people." In addition, though Ferrington states in his deposition that he checked on the warrant by telephone before he made the arrest, Florence has submitted an affidavit, with subpoenaed exhibits from the telephone company, showing that "there were no outgoing phone calls made" from the pay phone Ferrington claims that he used.

On October 31, 1995, Florence and Anellee appeared in Brooklyn Family Court and the judge ordered Florence to allow Edwards to conduct a home assessment and family interview on November 1, 1995. According to defendants, Florence "admitted [in court] to hav[ing] given the defendant the wrong address" and the "judge ordered [Florence] to meet the defendant in the lobby of the building."

On November 1, 1995, Edwards made a home assessment and interviewed Anellee. Her report stated that the child "appears healthy and well-cared for. No visible marks or bruises observed. No scars or old scars observed on wrists." Edwards also interviewed the assistant principal and attendance teacher at Anellee's school and they both stated they never had cause to suspect any abuse or neglect.

When Florence and Anellee returned to Brooklyn Family Court on November 30, 1995, Annelle's court-appointed law guardian and Edwards informed the family court judge that Anellee recanted all her allegations in the her letter and had explained that her aunt Campbell had forced her to write the letter. Edwards also told the court that Anellee "appears well-cared for," that her home was "lovely and well-kept," that she had "[a]ll the basic necessities," and that she performed "very well academically." On this basis, Children's Services asked to withdraw the child abuse petition.

But Anellee's law guardian opposed the motion and wanted additional time to investigate the matter herself. She stated "I don't want to disbelieve my client." But that "[w]ith a letter [Anellee's letter] like this in my file I would be less than responsible as a law guardian to a 12 year old because I don't know if she's being forced to recant right now." The court agreed to not withdraw or dismiss the petition and stated "I'm going to give the law guardian more time. . . . It sounds like what the caseworker [Edwards] says is true . . . . [but] I must complete the investigation. . . . There may be something else on the bottom of it that I'm unaware of. I don't want to have hindsight later."

The court decided to adjourn until January 3, 1996, to conduct an in camera interview of Anellee. On January 3, 1996, the court interviewed Anellee and decided to adjourn again until she could be examined by a psychiatrist.

On January 17, 1996, February 28, 1996, and March 25, 1996, Edwards made three more home visits and reported each time that Anellee appeared healthy and well-cared for and had no visible marks or bruises.

On April 9, 1996, Dr. Richard Dudley, a psychiatrist, interviewed Anellee and prepared a report that concluded "there is no psychiatric reason to suspect that Anellee . . . has been abused by her mother (or her sister), and there is no psychiatric reason to suspect that [Anellee] has anything but a good relationship with her mother (and her sister)." The report also found "quite credible" Anellee's recantation of her letter as well as her explanation that her aunt Campbell, who had a long-standing rivalry with Florence, had forced her to write it. Anellee also reported that she still feared her aunt Campbell, because "her aunt had told her that she would stop at nothing to get her [and] . . . that she could just dial a telephone number and make things happen."

Edwards followed-up with one final home visit on April 22, 1996, and reported again that Anellee appeared healthy and well-cared for and had no visible marks or bruises.

On May 3, 1996, Children's Services requested to withdraw its child abuse petition with the Brooklyn Family Court. The court granted the request on May 5, 1996. The next day, Children's Services closed the case as "unfounded."

II

Under Rule 56 of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The substantive law governing the case will determine those facts that are materi-

al, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is warranted only if "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Id.*

Moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III

### *Children's Services Defendants*

Florence claims that defendants Edwards, Felton, Croft, Hammons, Lipsey, and Simonowitz ("Children's Services defendants") are liable to her under 42 U.S.C. § 1983 for malicious prosecution without probable cause, seeking a warrant without probable cause, and for violating her family's privacy rights and Fourth Amendment rights for continuing the proceedings and home visits after Anellee's recantation. Florence asks this Court to reject any assertions of qualified immunity by the Children's Services defendants on the grounds that these defendants acted unreasonably, with deliberate indifference, and maliciously.

■ Government employees enjoy qualified immunity " 'when they perform discretionary functions if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that [their] acts did not violate these clearly established rights.' " *Tenenbaum v. Williams*, 193 F.3d 581, 596 (2d Cir.1999) (quoting *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir.1998)). " 'The objective reasonableness test is met—and the defendant is entitled to immunity—if officers of reasonable competence could disagree on the legality of the defendant's actions.' " *Id.* at 596 (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995) (internal quotations omitted)). "Government officials are deemed to have 'presumptive knowledge of and respect for basic, unquestioned constitutional rights.' " *Walsh v. Franco*, 849 F.2d 66, 68 (2d Cir. 1988) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2736–37, 73 L.Ed.2d 396 (1982) (internal quotations omitted)).

■ Florence claims that the Children's Services defendants initiated child abuse proceedings and requested the warrant with a child abuse petition based partly on "false statements," and therefore lacked probable cause. Of particular outrage to Florence is the petition's allegation that she "has a history of excessively beating [Anellee] with various objects," "has threatened on a number of occasions to kill [Anellee]," "allows [Anellee's] older sibling to beat her excessively," and that "[Anellee] is extremely fearful of [Florence] and has contemplated committing suicide." The petition also alleged that Florence "refused to cooperate with [Children's Services] by refusing to disclose her residence."

According to Florence, "Edwards swore those allegations were true based on her personal knowledge" even though she knew that Florence had been cooperating and "when she did not know whether [the allegations of physical abuse and neglect] were true or false." As a result, Florence believes there is a genuine issue of fact as to whether the Children's Services defendants acted unreasonably, with deliberate indifference, or maliciously.

This Court disagrees. Florence mischaracterizes the petition by construing it as having been filed "based on [Edwards'] personal knowledge."The petition states that the allegations were based "upon information and belief." And without any doubt, the investigatory file from Grenada

and Anellee's letter amply supplied such "information and belief."

Anellee's letter, with its shocking allegations and vivid detail, should have raised nothing less than the utmost alarm with Children's Services. The letter was handwritten in child-like script, used imperfect and unsophisticated grammar and diction, and was believable. The Grenada Report only heightened the concern. Its statements corroborated Anellee's letter and read as though a thorough investigation had already been conducted. Indeed, the cover letter accompanying the investigatory file alerts the reader immediately:

> Anellee McSween has encountered verbal and physical abuses by her mother for quite a long time. She was eventually 'dumped' in Grenada to live under very inhumane conditions as a form of punishment. . . .

Handed such an investigatory file, it can hardly be doubted that a reasonable caseworker would have probable cause to suspect child abuse.

The evidence also supports the conclusion that a reasonable caseworker would believe that Florence was refusing to cooperate with the investigation, and that a warrant was needed to secure such cooperation. Whether she actually intended her evasiveness is in dispute. But there is no issue of fact as to whether it was objectively reasonable to believe that the repeated confusion over Florence's actual address, generated solely by Florence's inability to give a correct apartment number, arose from her desire to keep Edwards away from Anellee. From appearances, Florence's actions seemed in conformity with the Grenada Report's warning that she "was very rude, uncooperative and abusive." Obtaining a warrant was therefore objectively reasonable to ensure that the investigation proceeded apace and to protect Anellee from the suspected abuse. Edwards did not act unreasonably, with deliberate indifference, or maliciously.

Florence next argues that the child abuse proceedings and home visits should have ended once Anellee recanted and that by continuing the proceedings and visitations, they acted unreasonably, with deliberate indifference, and maliciously.

The record offers no support for this argument. Florence says that the Children's Services' failure to withdraw or amend the petition forced the child abuse proceedings to continue. But Children's Services did in fact request to withdraw the petition as early as November 30, 1995. The family court judge denied that request in order to keep the investigation open for Anellee's law guardian. Later, after the court's own in camera interview of Anellee, the court wanted the case to remain open until after a psychiatrist had interviewed Anellee.

Amending the petition was also unnecessary. Edwards candidly reported to the court her findings and she told the court that Anellee appeared "well-cared for" and that her previous visit and interviews turned up no evidence of abuse or neglect. Children's Services did not attempt to conceal any exculpatory information.

It was the court's decision to continue the proceedings and the investigation, and it was the Children's Services defendants' obligation to abide by that decision. *See* New York Social Services Law § 424 (requiring Children's Services employees to "assist the family court . . . during all stages of the court proceeding. . . .").

Nevertheless, Florence argues that the Children's Services defendants lacked justification to continue their home visits and knew this. She says that Children's Services had concluded that the child abuse allegations were "unfounded" and that it had closed its internal investigation on or about December 19, 1995.

But the only evidence that supports this latter claim is what appears to be Edwards' handwritten narrative update dated December 19, 1995, written on a computer print-out labeled "New York State Department of Social Services; State Central

Register; Report Record Transmittal." Edwards writes: "Allegations were unsubstantiated. Case is still in court. [Mother] was served a warrant for failure to produce child. [Child] recanted [account]. No visible marks or bruises present. Allegations unfounded."

Nowhere does the narrative or print-out indicate that Children's Services closed its internal investigation. Indeed, Edwards notes that the "[c]ase is still in court."

Under the circumstances, Edwards acted appropriately and reasonably by continuing the home visits. She visited once per month from January 1996 through April 1996, with the final visit after Dr. Dudley's interview with Anellee in early April. In her deposition, Florence described one of those home visits as lasting "[m]aybe forty-five minutes[ ] or less," and Edwards "asked some questions, again, of the child, asked me some questions, checked the place, and she left." Nothing in Florence's description of the home visits indicates that Edwards's actions were unusually or unnecessarily intrusive or objectionable.

Given the seriousness of the child abuse allegations and the evidence supporting them, especially Anellee's letter, there are no genuine issues of fact as to whether competent caseworkers could reasonably believe in the legality of Edwards' home visits. To understand this, one need only imagine the potential tragedy that could have occurred if Florence had in fact forced Anellee to recant and the allegations were true.

Understandably, Florence feels outraged by the scandalous and opprobrious implications of the continuing investigation, and surely she hoped the government would leave her family alone after her child recanted. But the reliability of Anellee's recantation could be verified only after careful scrutiny. The frightening clarity with which Anellee claimed abuse deserved nothing less than a thorough and careful investigation. In this case, though an apparently innocent parent was implicated, this Court has little difficulty in finding that all of the Children's Services defendants enjoy qualified immunity for continuing the proceedings, investigation, and home visits. *See Robison v. Via,* 821 F.2d 913, 921 (2d Cir. 1987); *Taylor v. Evans,* 72 F.Supp.2d 298, 311 (S.D.N.Y.1999).

### Police Officers Ferrington and Thomas

Florence argues that defendants Ferrington and Thomas violated her right to be free from arrest without probable cause, an established constitutional right. *See Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991). Ferrington and Thomas both assert qualified immunity for their actions.

■ An arresting officer enjoys qualified immunity from a claim for "arrest without probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino,* 950 F.2d at 870. In evaluating the qualified immunity defense, the court "must consider those facts available to the officer at the time of the arrest and immediately before it." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996). If "any rational jury could find ... that the [defendant police officers'] actions were objectively unreasonable, then summary judgment must be denied." *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997)

■ It is undisputed that Ferrington and Thomas arrested Florence pursuant to a vacated warrant. And viewed in the light most favorable to Florence, Ferrington did not check on the status of the warrant before the arrest even though he had instructed her on how to vacate the warrant, and even though she told him she had gone to court the previous day. It is also undisputed that Ferrington knew Florence from his community policing beat and thought well enough of her that he

instructed her on how to voluntarily surrender.

But the evidence also shows that Florence told Ferrington that she would "go to the Brooklyn courts on [October 16, 1995]," the day before her arrest, and that Ferrington told her to contact him after she had gone to court, so he would know she had taken care of the warrant. It is undisputed that she never called Ferrington.

The question of reasonableness is a close one, but this Court cannot find as a matter of law that Ferrington's and Thomas's actions were objectively reasonable. Up to the point that Ferrington and Thomas confronted Florence inside P.S. 6, they may have reasonably believed that they had probable cause to make the arrest because she never called Ferrington. But once she protested that she had gone to court the day before, a rational jury may find objectively unreasonable their continued belief in probable cause. In light of Ferrington's past interactions with Florence, her protestations might have opened a window of doubt that a reasonable officer would have addressed by making a simple telephone check. *Cf. Oliver v. Cuttler*, 968 F.Supp. 83, 94 (E.D.N.Y.1997).

Though Thomas did not have any prior conversations with Florence, he heard her protestations, and the evidence indicates his awareness of Ferrington's and her prior interactions. Thomas had no less reason to suspect the validity of probable cause.

Therefore defendants Ferrington and Thomas are not entitled to summary judgment on the basis of qualified immunity.

Because no evidence has been adduced to implicate defendant Bratton in his individual capacity, the claim against him for arrest without probable cause will be dismissed.

### Municipal Liability

Florence claims that defendant New York City, ("City") defendants Croft, Hammons, Lipsey, and Simonowitz, in their official capacities as supervisory officials of Children's Services, and defendant Bratton, in his official capacity as Commissioner of the New York City Police Department, are liable to her under 42 U.S.C. § 1983 for constitutional violations resulting from a municipal custom or policy. In particular, Florence claims that Children's Services' failure to properly train or supervise its caseworkers caused them to maliciously prosecute and seek a warrant for Florence without probable cause and conduct intrusive home visits. Florence claims that Bratton's failure to properly train or supervise Ferrington and Thomas caused them to arrest her without probable cause.

■■■ A municipality and its supervisory officials may be held liable under 42 U.S.C. § 1983 for unconstitutional acts by non-supervisory employees, if the Florence can establish that "the violation of his constitutional rights resulted from a municipal custom or policy." *Ricciuti v. New York City Transit Authority*, 941 F.2d 119, 122 (2d Cir.1991). A "single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Id.* at 123. An inference that a policy exists may be drawn from "circumstantial proof, such as evidence that the municipality so failed to train [or supervise] its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Id.*

■■■ In explaining the type and degree of circumstantial proof required for a Florence to establish such "deliberate indifference," the Second Circuit has stated that the plaintiff must show: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by

the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir.1992).

█ Florence's claim against the City and Bratton for failing to train on warrant-checking procedures has some facial appeal. A supervisory official should know that police officers will confront situations where the validity of a warrant is in question, that the situation would be more competently navigated with training or supervision, and that the wrong choice would result in an arrest without probable cause. In fact, Ferrington and Thomas made the arrest on a vacated warrant under circumstances where proper training might have avoided the constitutional violation.

But it is undisputed that Ferrington and Thomas did receive training on how to check the validity of "family court warrants." As Ferrington explained in his deposition, police officers had one day of "warrant training," and learned that family court warrants were checked by making a "phone call to the record room in the family court courthouse." Ferrington's and Thomas's mistake was to not call the record room after Florence told them she had been to court the previous day. Had Ferrington and Thomas acted in accordance with the training they received, they may have discovered the warrant's invalidity and avoided the unconstitutional arrest.

Florence responds that this training was insufficient because it was not the "most reliable method of assuring that the warrant was valid." Because the most reliable method of checking a family court warrant would be to pull the file and perform a manual check, she argues that Ferrington and Edwards would have received constitutionally adequate training only if they were trained to go to the courthouse and manually check the warrant.

The argument is not only impractical, but it is incorrect as a matter of law. The one-day warrant training that Ferrington and Thomas received does not evidence a

"deliberate indifference to the constitutional rights" of persons within the City's jurisdiction. *See City of Canton v. Harris*, 489 U.S. 378, 391, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989) ("In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform."); *Cole v. New York City Police Dep't*, No. 94 CV 2070, 1998 WL 471676, at *5 (E.D.N.Y. Aug. 7, 1998). It shows just the opposite. Ferrington and Thomas were instructed that on certain occasions they would need to verify the continuing validity of a warrant, and they were instructed on the most practicable means of doing so. In this case, the problem was not the training provided by the City, it was Ferrington's and Thomas's decision to not adhere to it.

Regarding municipal liability for the actions of the Children's Services defendants, because this Court has found that none of those defendants violated Florence's constitutional rights, it follows that there will be no municipal liability under § 1983.

### IV

In addition to claims under federal law, the complaint also alleges several tort claims under state law for false arrest, false imprisonment, malicious prosecution, and negligence.

█ A claim for malicious prosecution under New York law requires a plaintiff to prove, among other things, lack of probable cause and actual malice. *See Drake v. State*, 126 Misc.2d 309, 482 N.Y.S.2d 208, 210 (Ct.Cl.1984). Because there is insufficient evidence of maliciousness and because defendants had probable cause to initiate and continue child abuse proceedings against Florence, the claim for malicious prosecution will be dismissed.

█ Under New York law, a claim for false arrest and false imprisonment present essentially the same claim. *Budgar v. State of New York*, 98 Misc.2d 588, 414

N.Y.S.2d 463, 466 (Ct.Cl.1979). Defendants argue that an "arresting officer may rely upon the fact that he possesses a judicially issued arrest warrant and thus is insulated from a claim of false arrest and false imprisonment."

■■■ The law does not support defendants' argument. If an arrest is made pursuant to an invalid warrant, summary judgment will be defeated unless the defendant can "show that the arrest was based upon probable cause." *Dabbs v. State*, 59 N.Y.2d 213, 464 N.Y.S.2d 428, 429, 451 N.E.2d 186 (1983). Ferrington and Thomas did not possess a valid warrant when they arrested Florence, and, as discussed earlier, questions of fact remain as to whether it was objectively reasonable for Ferrington and Thomas to continue to believe they had probable cause. Therefore this Court will retain jurisdiction over the state law claim for false arrest and imprisonment against defendants Ferrington and Thomas.

■■■ Florence also claims that the "arrest and prosecution of Florence constituted a gross breach of [the defendants' duty to act with reasonable care toward Florence] and a gross deviation from accepted professional standards." New York law prohibits recovery under a general theory of negligence when the " 'traditional remedies of false arrest and imprisonment' are available." *Shea v. County of Erie*, 202 A.D.2d 1028, 609 N.Y.S.2d 473, 474 (4th Dep't 1994) (quoting *Boose v. City of Rochester*, 71 A.D.2d 59, 421 N.Y.S.2d 740, 744 (4th Dep't 1979)). There being no other basis for a negligence claim, the claim for negligence will be dismissed.

## V

For the foregoing reasons, defendants' motion for summary judgment is granted with respect to defendants Shirley Edwards, Barbara Felton, Kathryn Croft, Marva Hammons, William Bratton, the City of New York, Lynette Lipsey, and Morris Simonowitz. Defendants' motion for summary judgment is denied with respect to defendants Edward Ferrington and Carl Thomas.

This Court will retain jurisdiction over the state law claim for false arrest and imprisonment against defendants Edward Ferrington and Carl Thomas.

So ordered.